The **AVOYELLES SPORTSMEN'S LEAGUE, the Point Basse Hunting Club, Inc., the Avoyelles Bass Runners, and the Environmental Defense Fund, Inc., National Wildlife Federation, Inc.**

v.

**Clifford L. ALEXANDER, Secretary of the Army, John W. Morris, Chief of Engineers, Colonel Robert H. Moellering, Vicksburg District Engineer, Douglas M. Costle, Administrator of the U. S. Environmental Protection Agency, Adlene Harrison, Regional Administrator of the U. S. Environmental Protection Agency, Elder Realty Company, Inc., Albert Prevot, and H. P. Lambright, Bayou Lafourche, Inc., and Lake Ophelia, Inc.**

Civ. A. No. 78–1428.

United States District Court,
W. D. Louisiana,
Alexandria Division.

June 9, 1979.

Donald R. Wilson, Marksville, La., James B. Tripp, New York City, Michael Osborne, New Orleans, La., F. Walter Conrad, Houston, Tex., for plaintiffs.

William D. Brown, Monroe, La., David B. Beers, Nancy C. Shea, Richard S. Wasserstrom, Washington, D. C., for amici curiae.

Frances Allen, Shreveport, La., Charles K. Reasonover, New Orleans, La., Louis D. Curet, Baton Rouge, La., Dan E. Melichar, Alexandria, La., Joseph S. Cage, Shreveport, La., for defendants.

## OPINION

NAUMAN S. SCOTT, Chief Judge.

Plaintiffs[1] brought this declaratory and injunctive action alleging that land-clearing operations being carried on by the private defendants[2] have and will: alter and modify the course, condition and capacity of the navigable waters of the United States in violation of § 10 of the Rivers and Harbors Act of 1899, 33 U.S.C.A. § 403; result in the discharge of dredged and fill material into the waters of the United States in violation of § 404 of the Federal Water Pollution Control Act (hereinafter FWPCA), 33 U.S. C.A. § 1344; result in the discharge of pollutants into the waters of the United States in violation of § 402 of the FWPCA, 33 U.S.C.A. § 1342; and violate Louisiana State law under Louisiana Civil Code arts. 667 and 857. The plaintiffs requested that we compel the federal defendants[3] to regulate the land-clearing activities and enjoin the landclearing activities until the extent of the federal defendants' jurisdiction has been determined and permits applied for under 33 U.S.C.A. §§ 403, 1342 and 1344.

The land subject to this proceeding and being cleared is an approximately 20,000 acre tract (hereinafter referred to as the Lake Long Tract) situated in Avoyelles Parish, Louisiana between the Grassy Lake State Management Area and the Spring Bayou State Management Area. It lies within the Bayou Natchitoches basin which, along with the Ouachita, Black and Tensas river basins, makes up the Red River backwater area. The Bayou Natchitoches basin itself is an area comprised of approximately

---

1. The Avoyelles Sportsmen's League, Inc., Point Basse Hunting Club, Inc., Avoyelles Bass Runners, Inc., Ira J. Marcotte, Avoyelles Natural Guard, Inc., The Environmental Defense Fund, Inc., and The National Wildlife Federation.

2. Albert Prevot, H. P. Lambright and Elder Realty Co., Inc.

3. Clifford L. Alexander, Secretary of the Army; John W. Morris, Chief of Engineers, U. S. Army Corps of Engineers; Colonel Robert L. Moellering, Vicksburg District Engineer, U. S. Army Corps of Engineers; Douglas Costle, Administrator of the U. S. Environmental Protection Agency; and Adlene Harrison, Regional Administrator of the U. S. Environmental Protection Agency.

140,000 acres. Much of this basin has been cleared of forest but before the private defendants' land clearing operations commenced, approximately 80,000 acres of this area still was forested. Consequently, prior to the commencement of the private defendants' land-clearing operations, the Lake Long tract represented one-quarter of the remaining forested acreage in the Bayou Natchitoches basin.

The Bayou Natchitoches basin serves as a major overflow or backwater area for the Red River. Backwater flooding occurs in the Bayou Natchitoches basin when the Red River rises to a point where its waters cannot flow downstream efficiently and instead flow west into Bayou Natchitoches, then into Bayou Jeansonne, over the Lake Long tract and further westward into the Spring Bayou State Management area. Generally, during the recession of backwater floods, the flood waters on the Lake Long tract drain in an easterly direction back into the Red River.

More than half of the tract, i. e., everything at or below 45.8 feet MSL, is subject to the average annual flood.[4] Virtually all of the tract, i. e., everything at or below 49.6 feet MSL is subject to the average bi-annual flood.

The clearing of the Lake Long Tract began in June of 1978. Sometime prior to that loggers had harvested much of the commercially valuable hardwoods with chainsaws. Thereafter, the private defendants took various steps to remove all the remaining trees and vegetation from the tract so that it could be put to agricultural use and specifically into soybean production.

Initially, bulldozers outfitted with shearing blades cut the timber and vegetation at or just above ground level. The shearing blades were v-shaped, had a serrated edge and flat bottom and were approximately 18–20 feet in length. The blades were adjusted to be free floating so that they would ride along the top surface of the ground. Occasionally, however, the blades would gouge the surface of the ground. Although the blades were adjusted to ride on the ground's surface, they did scrape the leaf litter and humus that overlaid the soil as they moved from tree to tree.

After the shearing was completed in a section, bulldozers outfitted with rake blades pushed the felled trees into wind rows. The upper portion of the raking blade was solid whereas the lower portion had tines that permitted soil to pass through the openings. The raking blades were also outfitted so that they generally operated on top of the soil. However, in the process of windrowing the trees and debris, soil and leaf litter was also scraped into the windrows.[5] It is not clear whether the blades themselves or the broom-like action of the trees and brush that they were pushing actually scraped the soil and the overlying leaf litter. In any event the photographic evidence clearly demonstrated that soil and leaf litter was piled up during the windrowing process—this movement filled in low areas and along with the discing which followed, had a levelling effect on the surface of the land.

The trees and other vegetation that had been windrowed were then burned. The remaining ashes were later disced into and across the tract. Some of the felled trees and other debris would not burn. This material was buried in four or five pits, each approximately 50 feet long and 6 feet deep that had been dug with backhoes by the private defendants.

Tractors pulling chunk rakes would go over the areas that had been sheared and windrowed and rake together any remaining debris. Basically, the chunk rakes were sets of tines that were outfitted on cultivators that had had their blades removed. The chunk rakes gathered the small debris into piles where it was presumably burned. These ashes were also disced into the soil.

---

4. Basically the average annual flood means certain elevations on the tract can be expected to flood every year based on a statistical average.

5. Various photos introduced into evidence showing the burned windrows revealed that soil was piled up during the windrowing process.

After the shearing, windrowing and chunk raking the land was disced to prepare it for soybean cultivation. A disc is a bowl-shaped blade that cuts into the ground and fluffs the soil up. The disc's used on this tract were 24 inches in diameter and would cut into the ground approximately 9 inches. During discing, some soil would ride in front of the disc and would be redeposited in other areas of the tract, resulting in substantial displacement and redepositing of the soil itself.

Defendants also dug a drainage ditch that was approximately three-quarters of a mile long. The earth excavated from the ditch was piled alongside the ditch and was to be spread over the adjacent area. Construction of at least four or five miles of additional ditches were contemplated for soybean cultivation.

On November 7, 1978 we granted a temporary restraining order whereby the private defendants were prohibited from engaging in any further landclearing activity. More specifically, they were prohibited from conducting ditch excavation, altering the surface of the land, logging, except by chainsaw, destroying vegetation, plowing, discing, or discharging any biologic material or pollutants onto the land. They were permitted to clean up debris already on the ground.

On January 17, 1979 it was ordered that the federal defendants prepare a final wetland determination within sixty days. The private defendants were permitted to engage in normal cultivation, plowing and seeding without obtaining a permit on the land already cleared, approximately 10,000 acres. The private defendants were ordered to and agreed under protest, to apply for permits under § 404 for any ditching, levee construction and drainage work construction on the land already cleared. As to the uncleared land, the prohibitions of the temporary restraining order remained unchanged.

On March 26, 1979 the federal defendants filed their final wetland determination which designated certain portions of the tract, including substantial portions of the cleared lands, to be wetlands. Thereafter the private defendants filed objections to this determination.

The wetland determination also contained a statement concerning what activities of the private defendants were subject to the permit requirements of § 404.

"A section 404 permit is not required for the shearing of trees where no earth (other than de minimis) is moved in the process and the trees are promptly removed through burning or other means. However, under the facts of this case as they are known to the government, a section 404 permit will be required for construction of drainage ditches in the wetland area delineated by the government in Exhibit I. While it is the government's understanding that the non-Federal defendants do not plan to build any dikes or levees in the waters of the United States, permits will be required if their plans change. Plowing, discing, and raking of the sort observed on the tract so far will not require a permit."

Both the plaintiffs and the private defendants objected to the Government's statement on the activities issue. Thereafter, it was decided to bifurcate the jurisdictional issue, i. e., what areas of the tract constitute wetlands, from the activities issue outlined in the statement attached to the government's determination. In accordance with this bifurcation it was agreed that the activities issue would be tried first. For the purposes of the trial on this issue it was stipulated, without prejudice to any party's rights to contest the validity of the final wetland determination, that the final wetland determination filed on March 26, 1979 was correct and that the wetland area was subject to the strictures of the FWPCA. Consequently, the only issue now before us is whether the type of activities allowed in the government's statement, such as the shearing of trees to convert forested wetlands to other purposes, require permits under the FWPCA and § 10 of the Rivers and Harbors Act of 1899. We hold that permits are required under § 404 of the FWPCA.

The declared objective of the FWPCA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 101(a) of the Act, 33 U.S.C.A. § 1251(a). Basically, two different types of pollution, subject to different programs of regulation, are envisioned by the Act; those that emanate from point sources and those that derive from non-point sources. Point sources of pollution except those exempted under § 404(f)(1) are regulated by permit programs under §§ 402 and 404 of the FWPCA.[6] Other sources of pollution are regulated under the § 208 best management practice program and do not require a permit.[7]

■ Section 301(a) of the FWPCA, 33 U.S.C.A. § 1311(a) is the keystone of the Act's attack on point sources of pollution. That section makes it unlawful to "discharge any pollutant" into the waters of the United States unless a permit is granted under §§ 402 or 404. Although the literal terms of § 301(a) do not make it clear that it is directed only at point sources of pollution, the definition of "discharge of a pollutant" in § 502(12) of the FWPCA, 33 U.S.C.A. § 1362(12), makes this fact evident.

"The term 'discharge of a pollutant' and the term 'discharge of pollutants' each

means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." § 502(14) of the FWPCA, 33 U.S.C.A. § 1362(14) defines a point source as any "discernable, confined, and discreet conveyance."

The permit program that is of primary concern in this litigation, § 404, regulates the discharge of dredged or fill material and is administered by the Corps of Engineers. The terms "dredged material" and "fill material" are not defined in the Act, however, they are defined in the Corps regulations implementing the § 404 program:

"The term 'dredged material' means material that is excavated or dredged from water of the United States." 33 C.F.R. § 323.2(k).

"The term 'discharge of dredged material' means any addition of dredged material into the waters of the United States. * * * *The term does not include plowing, cultivating, seeding and harvesting for the production of food, fiber, and forest products.*" 33 C.F.R. § 323.2(1).[8] (Emphasis supplied)

---

**6.** The phrase "point source pollution" as utilized hereafter shall refer to point source pollution not exempt under the provisions of § 404(f)(1).

We are well aware of the dispute as to whether the activities mentioned in § 404(f)(1) are excluded from the Act because Congress felt that these activities do not involve the discharge of dredged or fill material or whether those activities involve dredged or fill material but are exempt. The Government contends the former, that they do not involve dredged or fill material and that other activities of normal farming and silviculture that do involve the discharge of dredged or fill material would be subject to the permit program unless exempted by § 404(f)(1)(B) through (E). On the other hand the amici curiae (National Forest Products Association, American Paper Institute, and Louisiana Forestry Association) contend that § 404(f)(1)(A) exempts all normal agricultural and silvicultural activities, even those involving the discharge of dredged or fill material. Although we believe that the position of the section, the specific language of § 404(f)(1), and the physical character of the activity described

therein clearly indicate that § 404(f)(1)(A) activities involve the discharge of dredged and fill material, we need not resolve this dispute since we have determined that the clearing activities do not constitute normal farming or silviculture and is also barred as an exemption under § 404(f)(2).

**7.** In 1977 the Clean Water Act amendments to the FWPCA amended § 208 such that some dredge and fill activities that have little or no adverse impact on the waters of the United States can be regulated under a state best management practice program under § 208(b)(4)(B). See pp. 420–421 and 530 of the Legislative History of the Clean Water Act of 1977 (hereinafter "Legislative History"). There has been no contention that Louisiana has such a program or that the defendants' activities are properly regulated under § 208(b)(4)(B).

**8.** The preface to the Corps of Engineers' regulations implementing the § 404 permit program states "that activities such as plowing, seeding, harvesting, [and] cultivating . . . do not involve discharge of dredged or fill material."

"The term 'fill material' means any material used for the primary purpose of replacing an aquatic area with dry land by changing the bottom elevation of a water body. * * *" 33 C.F.R. § 323.2(m). "The term 'discharge of fill material' means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: placement of fill that is necessary to the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt or other material for its construction; site development fills for recreational, industrial, commercial, residential, and other uses; causeways or road fills, dams and dikes; artificial islands; property protection and/or reclamation devices such as rip-rap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewerage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; and artificial reefs. *The term does not include plowing, cultivating, seeding and harvesting for the production of food, fiber, and forest products.*" 33 C.F.C. § 323.2(n).[9]

However, as indicated above, a permit is not required for all discharges of dredged or fill material. § 404(f)(1) exempts certain activities from the permit program. The exemptions contained in § 404(f)(1)(A) and (C) are pertinent herein. They provide:

"(f)(1) Except as provided in paragraph (2) of this subsection, the discharge of dredge or fill material—

(A) from normal farming, silviculture, and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices;

* * * * * *

(C) for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;

* * * * * *

is not prohibited by or otherwise subject to regulation under this section or section 301(a) or 402 of this Act (except for effluent standards or prohibitions under § 307)."

Yet, the § 404(f)(1) exemptions are not absolute since they are subject to the limitations of § 404(f)(2) which provides:

"Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters may be reduced, shall be required to have a permit under this section."

Since "navigable waters" includes wetlands, 33 C.F.R. § 323.2(a), it is clear that the following issues must be resolved in determining whether any or all of the private defendants' landclearing activities require a permit under § 404: (1) are there any point sources of pollution? (2) if so, is there a discharge of dredged or fill material? (3) if so, does the activity constitute normal farming or silviculture activities which are exempted from the permit program under § 404(f)(1)(A) and (4) if so, will the activities result in a change in the use of the land so that the flow or circulation of the waters may be impaired or that reach of the waters may be reduced thereby making the exemption unavailable under § 404(f)(2)?

(1) Are there any point sources of pollution? § 502(14) of the FWPCA defines a point source as:

42 F.Reg. 37130 (July 1977). A similar statement is contained in the EPA regulations that implement the § 402 program. 41 F.Reg. 24710 (June 18, 1976).

These statements in the preface and the emphasized portions of 33 C.F.R. § 323.2(1) and 33

C.F.R. § 323.2(n) are overly broad since these activities, as shall be shown hereafter, are excluded only when performed as part of "normal farming, silviculture and ranching activities." § 404(f)(1)(A).

9. See note 7 supra.

"any discernable, confined and discrete conveyance, including but not limited to any . . . ditch, channel . . . discrete fissure, container, rolling stock . . . from which pollutants are or may be discharged. . . ."

■ We determine that defendants' land-clearing equipment (bulldozers fitted with V-blades, bulldozers fitted with raking blades, and the tractor-pulled rakes), ditch excavation equipment (the backhoe used to excavate the three-quarter mile drainage ditch as well as any equipment used to excavate the proposed drainage ditches) and discing equipment, (unless used in connection with "normal farming"),[10] are point sources. The general definition of point source and the illustrative examples connote that a point source is an isolable, identifiable activity that conveys a pollutant, dredged or fill material. The operation of defendants' equipment was certainly an identifiable and isolable activity. It also conveyed dredged or fill material since it collected, gathered and transported the sheared trees and vegetation, leaf litter and soil across the wetland which, for reasons set out below, we determine to be dredged material. It is clear beyond cavil that any machinery used in ditch excavation is a point source since such machinery excavates the wetland soil and then discharges this soil back into the wetland.

This determination is buttressed by the cases of *U. S. v. Fleming Plantations,* 12 E.R.C 1705 (E.D.La.1978), and *U. S. v. Holland,* 373 F.Supp. 665 (M.D.Fla.1974). In the former case it was determined that marsh buggies and draglines were point sources. In the latter case it was determined that dump trucks, draglines and bulldozers were point sources.

■ (2) Is there a discharge of dredged or fill material? As just indicated above, we have determined that the sheared trees and vegetation and scraped soil and leaf litter constitute dredged or fill material. We will deal first with the sheared trees and vegetation. To reiterate 33 C.F.C.

§ 323.2(k) defines dredged material as "material that is excavated or dredged from waters of the United States." This essentially means that excavated material is the removal of some part of the waters of the United States. When dealing with a traditional water body such as a lake or a river, this would involve digging up the bottom or floor of the water body. However, herein we are not dealing with such traditional water bodies. Rather the area in dispute has been determined to be a wetland. The term "wetlands" is defined as:

"those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, *a prevalence of vegetation typically adopted for life in saturated soil conditions.* Wetlands generally include swamps, marshes, bogs and similar areas." 33 C.F.R. 323.2(c). (Emphasis supplied)

■ The above quoted definition makes it clear that wetlands include the vegetation that grows thereon. Such lands in the absence of vegetation can supply hardly any of the purposes of the Act. Consequently, in determining what constitutes dredged material in a wetland area, the inquiry does not end at the surface of the earth or water. Rather, any such inquiry must also consider vegetation, the very thing that defines a wetland. Accordingly, we determine that clearing the land of trees and vegetation, which are parts of the waters of the United States under 33 C.F.R. § 323.2(a) and (c) constitutes the discharge of dredged material.

Our determination that the soil and detritus was scraped up and conveyed across the tract is buttressed by the fact that many of the small sloughs were filled and the larger ones were partially filled in the landclearing process. The process had a levelling effect which also qualified the material moved as fill material.

We feel that our determination follows the spirit as well as the letter of the law.

---

10. See note 7 supra.

A basic policy of the FWPCA is the protection of our nation's wetlands and the important functions they serve. The legislative history of the Clean Water Act amendments of 1977 reflects an abiding congressional concern with the functional importance of wetlands.[11]

The Corps regulations implementing the § 404 program set out some basic policies for evaluating permit applications. Particularly pertinent herein is § 320.4(b)(1) which begins by declaring that:

"Wetlands are vital areas that constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest."

The section then goes on to identify wetlands that are considered important to the public because of the functions they perform. 320.4(b)(2).

"(i) Wetlands which serve important natural biological functions, including food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic or land species;

"(ii) Wetlands set aside for study of the aquatic environment or as sanctuaries or refuges;

"(iii) Wetlands the destruction or alteration of which would affect detrimentally natural drainage characteristics, sedimentation patterns, salinity distribution, flushing characteristics, current patterns, or other environmental characteristics;

"(iv) Wetlands which are significant in shielding other areas from wave action, erosion, or storm damage. Such wetlands are often associated with barrier beaches, islands, reefs and bars;

"(v) Wetlands which serve as valuable storage areas for storm and flood waters;

"(vi) Wetlands which are prime natural recharge areas. Prime recharge areas are locations where surface and ground water are directly inter-connected; and

"(vii) Wetlands through natural water filtration processes serve to purify water."

Section 320.4(b)(3) goes on to provide that when the Corps conducts the public interest review for permit applications for wetland areas it should take into account the cumulative effect of many minor changes or alterations.

"Although a particular alteration of wetlands may constitute a minor change, the cumulative effect of numerous such piecemeal changes often results in a major impairment of the wetland resources. Thus, the particular wetlands site for which an application is made will be evaluated with the recognition that it is part of a complete and interrelated wetland area."

The evidence demonstrated that the Lake Long wetland area performed the functions mentioned in 33 C.F.R. § 320.4(b)(2)(i), (iii), (v) and (vii). Aside from the flood storage capacity function recognized in 33 C.F.R. § 320.4(b)(2)(v) which will not be affected by the removal of the wetland vegetation, the evidence disclosed that the other wetland functions performed by the Lake Long tract will be seriously impaired, if not destroyed, by permanent removal of the wetland's vegetation since the vegetation on

---

11. During the Senate debates on the § 404 permit program, Senator Stafford stated:

"The Federal Water Pollution Control Act amendments of 1972 mandated the restoration and maintenance of the chemical, physical, and biological integrity of the nation's waters. Full implementation of a § 404 decision making process is imperative if we are to achieve this objective. The § 404 process is an essential tool for preventing the unnecessary degradation of water quality by discharges of dredged or fill material. Without it, critical aquatic areas including swamps, marshes, and submerged grass flats, which are such an important segment of this Na-tion's water resource and are essential to the preservation of migratory and resident fish, bird and other animal populations, might otherwise be irrevocably destroyed.

"The lasting benefits that society derives from coastal and inland wetlands often far exceed the immediate advantage their owners might get from draining or filling them; we are losing wetlands at the rate of some 300,000 acres per year. The committee recognizes the need for a program which regulates the discharge of dredged or fill material into our waters and wetlands." Legislative History 881–882.

the land, not the land itself, makes these functions possible.

*Functions identified in 33 C.F.R. § 320.-4(e)(2)(i)*: Forested wetland provides habitat for many animals such as deer, otter, beaver and nutria. Of course, cleared agricultural land does not provide food and shelter for these animals.

The permanent removal of the trees and vegetation will also result in a loss of detritus—an important link in the aquatic food chain. Detritus, a particulate organic material formed when bacteria, insects and other small organisms feed on the fallen leaves that have accumulated on the forest floor (referred to as leaf litter), is an important source of food energy for the fish and shellfish of the Natchitoches Basin and Red River. Fish and shellfish that are carried into the backwater area feed heavily on detritus. The receding flood waters carry out detrital material into the Red River where it is used as food.

Clearing of the wetland's vegetation will also seriously impair fish spawning. Fish that inhabit the Red River and its basins spawn in the backwater areas. Many of these fish are broadcast spawners—they spew their eggs out into the water which attach to vegetation by means of an adhesive material that covers them. The eggs will have no vegetation on which to attach after clearing, and as a result the eggs will fall to the bottom where they will be covered with silt resulting in suffocation of the embryo.

Fish nursery grounds will also be adversely affected by the clearing. Many fish larvae use the backwater area as a nursery where they feed on detritus and seek out vegetated areas for protection from predators. This will no longer be possible if the wetlands are cleared.

*Functions identified in 33 C.F.R. § 320.-4(b)(2)(iii)*: Sedimentation patterns will be adversely affected by clearing since there would be a drastic increase in the amount of sedimentation produced by the wetland. Forested wetland produces only three-quarters of a ton of sediment per acre yearly whereas agricultural land produces substantially more than five tons of sediment per acre yearly.

In addition, there will be an increase in the rate of erosion if the land is cleared. The forest overstory tends to break the momentum of precipitation and thereby decrease the impact of the precipitation on the soil lying below. The leaf litter and humus which covers the forest floor also protects the underlying soil from the impact of precipitation. If cleared, the soil would be subject to the full impact of the rain and will erode at a quicker rate than it would if it remained forested. Of course, this increased erosion helps explain why sedimentation will be greatly increased after clearing.

The wetland's natural drainage characteristics will also be affected by clearing since precipitation runs off agricultural land much quicker than it does from forested land. On forested land, leaf litter and humus lying on the forest floor absorbs much of the precipitation and thereby slows down the rate of drainage. Additionally, tree roots slow down the rate of drainage since they trap and hold precipitation. Needless to say, the rate of drainage will be further increased by any ditching activities.

*Function identified in 33 C.F.R. § 320.-4(b)(2)(vii)*: As precipitation slowly drains off a forested area it percolates through the leaf litter and humus which tends to purify it. If there is no leaf litter and humus to act as a filtration system, needless to say, this purification process will be seriously impaired if not destroyed.

The FWPCA would be emasculated insofar as wetlands are concerned were we to conclude that the permanent removal of the wetland's vegetation in the process of converting it to agricultural land was not subject to the § 404 permit program. As the above discussion makes evident, wetlands are important to the public interest because of the various functions they perform. If one destroys a wetland's ability to perform these functions, he has in effect destroyed the wetland insofar as the public interest is concerned. Many of the functions that

wetlands perform are dependent on the presence of vegetation. · Obviously, if a wetland area is cleared of its vegetation it would no longer functionally exist in many respects and the public interest would be seriously affected. Common sense dictates that an activity that results in the effective destruction of a wetland resource should be subject to regulation under an Act that has as its purpose the restoration and maintenance of the "chemical, physical and biological integrity" of our nation's wetlands.

(3) Does the activity of the private defendants constitute normal farming or silviculture so as to be exempt from the § 404 permit program by § 404(f)(1)(A)? We note at the outset that the legislative history to the Clean Water Act indicates that the exemptions [12] to the § 404 permit program should be narrowly construed.

█ The literal terms of § 404(f)(1)(A) indicate that only activities that are part of an *ongoing* agricultural or silvicultural operation were intended to be exempted from the permit program and not activities, such as the private defendants' land-clearing operations, which convert forested bottomland into farmland. 404(f)(1)(A) speaks in terms of "normal" farming and silviculture. The word "normal" connotes an established and continuing activity. Moreover, the examples of normal farming and silviculture activity set out in 404(f)(1)(A) are also activities that would only occur on a continuing basis as part of an ongoing farming or forestry operation. There is not the slightest hint in the terminology of § 404(f)(1)(A) that the defendants' land conversion activities are comprehended under its terms. Bulldozers equipped with V-blades or with raking blades are not farming equipment.

Clearing timber is not an agricultural pursuit. No farming operation was or could have been contemplated until after the acreage was cleared.

Although clear-cutting may be part of a normal silviculture operation under other circumstances, it is clear that the private defendants' clear-cutting was not part of a normal silviculture operation herein since no regeneration of the timber is contemplated.

█ (4) Finally we are buttressed in our conclusion that the defendants' land conversion activities are not exempt under 404(f)(1)(A) by the fact that 404(f)(2) specifically takes away the exemption for activities that involve converting the use of the land. Even assuming arguendo that the clearing activities were normal farming or silviculture, the evidence demonstrated that these activities would fall within the technical terms of the 404(f)(2) limitation. Under that provision activities that would be exempted under 404(f)(1)(A) are denied exempt status if they are incidental to an activity which will convert a wetlands area to another use where the reach of the water may be reduced or the flow or circulation of the water may be impaired.

Private defendant's clearing of the land so that it could be used for soybean production was definitely a change in use. Since wetlands do not functionally exist apart from the vegetation that defines it, the clearing of all of the wetlands' vegetation will, in essence, destroy the wetland and, consequently, reduce the reach of the waters of the United States. Furthermore, the circulation and flow of the water will be impaired since the evidence demonstrated

12. During the House debates on the exemptions to the § 404 permit program, Representative Harsha stated:

"New subsection (f) of § 404 provides that federal permits will not be required for *narrowly defined activities specifically identified* in paragraphs A thru F that cause little or no adverse effects either individually or cumulatively. To assure that the extent of these exempted activities will not be misconstrued, paragraphs (f)(1)(D) and (E) and (f)(2) provide commonsense limitations to protect the chemical, biological, and physical integrity of the nation's waters. While it is understood that some of these activities may necessarily result in incidental filling and insignificant harm to aquatic resources, the exemptions do not apply to discharges that convert more extensive areas of water into dry land or impede circulation or reduce the reach or size of the water body." Legislative History p. 420. See also remarks of Senator Muskie and Senator Wallop at pp. 470 and 523 respectively.

that the land would drain at a faster rate after clearing. Additionally, during the clearing process small sloughs were filled and larger ones partially filled thereby levelling the land which will affect natural drainage patterns resulting in an alteration and impairment of the circulation and flow of the water. Of course, any ditching would surely impair the circulation and flow of the water since the ditches would accelerate drainage.

We find the government's statement is untenable. In essence the government contends that if you use land-clearing equipment which moves earth (other than de minimis) to clear a wetland, a permit is required under § 404. But if you clear the wetland "where no earth (other than de minimis) is moved" you can clear and destroy every acre of wetlands in the United States with impunity and without applying for a permit. It seems to us that the government has ignored the purposes of the act and has applied engineering and construction methodology and theory to an environmental problem, totally frustrating the purposes of the Clean Water Act.

> "There is no question that the systematic destruction of the nation's wetlands is causing serious, permanent ecological damage. The wetlands and bays, estuaries and deltas are the nation's most biologically active areas. They represent a principal source of food supply. They are the spawning grounds for much of the fish and shell fish which populate the oceans, and they are passages for numerous upland game fish. They also provide nesting areas for a myriad of species of birds and wildlife." Remarks of Sen. Muskie during Senate debate on § 404. Leg.History 869.

If the destruction and conversion of wetlands to another purpose is accomplished, does it really matter whether it is accomplished "where no earth (other than de minimis) is moved" or otherwise?

More specifically, does it make sense, as the Government's statement implies, that the excavation of ditch 6 feet deep and 100 feet long requires a § 404 permit (is de-

structive of wetlands) but that the clearing of 20,000 acres of forest wetlands by methods involving only de minimis movement of earth does not (is not destructive of such wetlands). The factual situation in this very proceeding demonstrates the error implicit in the Government's statement.

Since we have determined that defendants' land-clearing activities are subject to the § 404 permit program, we find it unnecessary to decide whether there was any violation of § 10 of the Rivers and Harbors Act of 1899 and § 402 of the FWPCA. *U. S. v. Fleming Plantations*, 12 E.R.C. § 1704 (E.D.La.1978).

■ Up to this point in the opinion we have been concerned with the uncleared wetlands on the Lake Long Tract, as the Government determination of March 26, 1979 has defined "wetlands". We now are concerned with the cleared wetlands on that tract. If the private defendants' clearing activities were not exempt under the provisions of § 404(f)(1)(A) as we have now determined then perhaps the private defendants should be ordered to restore the forested wetlands, *U. S. v. Fleming Plantation, supra.* But in our final injunction and order dated May 4, 1979, the private defendants were permitted to engage in normal farming operations on all wetlands that were cleared prior to the issuance of the temporary restraining order. This decision was based on the following equitable considerations: Defendants' land-clearing operations began in the summer of 1978. They had cleared several thousand acres when the Corps issued a cease and desist order so that it could determine what areas of the tract were wetlands and thus subject to its jurisdiction under the § 404 program. The private defendants stopped their land-clearing activities in compliance with the cease and desist order. Subsequently the Corps surveyed the tract and made a determination of what areas it considered to be wetlands. Thereafter the private defendants commenced their land-clearing operations and cleared several thousand acres that the Corps had determined not to be wetlands. On November 7, 1978 this court granted a temporary restraining order that prohibited all land-clearing and ditching ac-

tivities on the tract. The defendants have not engaged in any land-clearing activities or ditching activities since the TRO was granted. Unfortunately, the final wetland determination filed on March 26, 1979 by the federal defendants differed from the determination that had been made at the time of the cease and desist order by the Corps. As a result, the private defendants cleared some areas of the tract that had initially been determined not to be wetlands and which were subsequently determined to be wetlands in the March 26, 1979 wetland determination. There has been no evidence of any bad faith on the part of the defendants who at all times have acted in full compliance with the directives of the Corps and this court. Under such circumstances, we feel that the private defendants should be permitted to conduct normal farming operations on the land already cleared with the exception that no ditching will be conducted without § 404 permits on any of the wetland area including those areas that had already been cleared.