**SAVE OUR COMMUNITY and the City of Ferris, Texas, Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.**

**Civ. A. No. 3–90–0799–H.**

United States District Court, N.D. Texas, Dallas Division.

May 3, 1990.

Frederick W. Addison, III and Elizabeth E. Mack, Locke Purnell Rain Harrell, Dallas, Tex., for plaintiffs.

(EPA) Michael D. Rowe, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., (COE) Rebecca Gregory, U.S. Dept. of Justice, U.S. Attorney's Office, Dallas, Tex., (TRINITY) Jeff Civins, Vinson & Elkins, Austin, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SANDERS, Chief Judge.

### I. INTRODUCTION

This action for declaratory and injunctive relief challenges the draining of several ponds located on the proposed site of a landfill expansion. Plaintiffs, a citizens association and the City of Ferris, Texas, seek a declaratory judgment that Defendant Waste Management, Inc. is in violation of the Clean Water Act by its failure to obtain a "404(b)" permit prior to the commencement of draining. Plaintiffs also seek a declaration that the United States Army Corps of Engineers and the Environmental Protection Agency have either: (1) failed to perform a mandatory duty to enforce the § 404(b) permit provisions or, (2) incorrectly interpreted the Clean Water Act by determining that draining is not a regulated activity.

The Court granted Plaintiffs' application for a temporary restraining order on April 3, 1990. Plaintiffs now move for a preliminary injunction. Pending before the Court is Plaintiffs' Complaint ("Complaint") and Memorandum in Support of Application for Preliminary Injunction ("Plaintiffs' Memorandum"), filed April 2, 1990; Plaintiffs' Supplemental Memorandum, filed April 9, 1990; Defendant Waste Management, Inc.'s Response, filed April 16, 1990; Federal Defendants' Motion to Dismiss, filed

April 16, 1990;[1] Plaintiffs' Reply to Defendant Waste Management, Inc.'s Response, filed April 18, 1990; Defendant Waste Management, Inc.'s Response to Plaintiffs' Reply, filed April 23, 1990; and Plaintiffs' Response to Federal Defendants' Motion to Dismiss, filed April 23, 1990.

The Court makes the following findings of fact and conclusions of law pursuant to *Fed.R.Civ.P.* 52(a). Any findings which constitute conclusions or conclusions which constitute findings should be deemed the other, as appropriate.

## II. FINDINGS OF FACT

### A. *Parties*

1. Plaintiff Save Our Community ("SOC") is an unincorporated association of approximately 200 individuals organized to oppose expansion of the Skyline Landfill located in Ferris, Texas. One purpose of SOC is to promote the protection of the wetlands in and around its members' communities. Members of SOC reside in the cities of Ferris, Dallas, and Palmer, and in rural areas in Ellis and Dallas counties.

2. Plaintiff City of Ferris, Texas ("Ferris") is a Type A, General Law City existing pursuant to the laws of the State of Texas and performing the duties and responsibilities of a general purpose unit of government organized as a municipal corporation. The City has issued a resolution authorizing its counsel to take actions necessary with regard to the landfill and related matters.

3. Defendant Trinity Valley Reclamation, Inc. is a wholly-owned subsidiary of Waste Management of North America, Inc. (collectively referred to as "Waste Management").

4. Defendant Michael P.W. Stone, Secretary of the United States Army, and Defendant Col. William D. Brown, District Engineer of the Fort Worth District of the United States Army Corps of Engineers, a department of the United States Army (the "Corps"), are charged

with enforcement of and adherence to the statute that forms the basis of this action.

5. Defendant William Reilly is Administrator, and Defendant Robert E. Layton is Regional Administrator, Region VI, of the Environmental Protection Agency ("EPA"), and are charged with enforcement of and adherence to the statute that forms the basis of this action.

### B. *History of Project*

6. Waste Management is the owner and operator of a seventy-three acre landfill (the "Skyline Landfill") located near Ferris, Texas. Waste Management's Response at 2–3.

7. In January 1989, Waste Management filed an application with the Texas Department of Health to expand the Skyline Landfill from 73 to 340 acres. *Id.*

8. In May of 1987, Waste Management solicited an opinion from the Corps as to whether any portion of the proposed expansion area constituted "waters of the United States" subject to the Corps' jurisdiction. The Corps made a jurisdictional determination on May 29, 1987 that six or seven "ponds" located on the proposed expansion area were waters of the United States. Plaintiffs' Exs. D, E, F, G; Lea Aff. ¶¶ 3–6. The EPA concurred in this determination. Thomas Aff. ¶ 4.

9. The Corps and the EPA also determined that these regulated waters, which included wetlands, were subject to the permitting requirements of § 404(b) of the Clean Water Act. Plaintiffs' Exs. D, E, F, G, J, and L.

10. The ponds were artificially-created and formed in part through a prior owner's construction of levees to catch run-off water. Waste Management's Response at 2–3.

11. The United States Department of Fish and Wildlife ("Fish & Wildlife") corresponded with consultants for Waste Management on August 18, 1987 and in-

---

1. The Federal Defendants have requested that their motion to dismiss be treated as a motion for summary judgment.

formed them of the potential presence of endangered or threatened migratory birds in the project area. Plaintiffs' Ex. G.

12. Migratory birds such as ducks, herons and storks have been sighted at or near the ponds. Birdwell Aff. ¶ 2; Douglas Aff. ¶ 2.

13. Waste Management began draining the ponds through the use of a mechanical pump in 1988. Approximately ten acres of surface water remain from the original twenty-one acres. Waste Management intends to completely drain the ponds and remove rubble levees and dams used to retain runoff water. Once the wetlands have ceased to support plant and animal life characteristic of wetlands, Waste Management will seek from the Corps a redetermination of the site's jurisdictional status. Ultimately, Waste Management plans to utilize the drained areas for additional landfill space. Plaintiffs' Ex. L, O; Complaint ¶ 44; Transcript of Conference on Application for Temporary Restraining Order, April 3, 1990; Fielder Aff. at 2–3; Waste Management's Response at 2–4.

14. Waste Management has attempted to avoid unauthorized discharges of materials into the ponds during the course of draining. Some minor discharges have occurred. Fiedler Aff. at 4; Plaintiffs' Exs. L, N.

15. Waste Management and prior owners of the property have not permitted recreational use of the ponds since their creation. Fiedler Aff. at 2.

16. The Corps and the EPA have been aware of Waste Management's pumping activities since at least March 1989 and have failed to prevent this practice. Representatives of Waste Management have met and corresponded with representatives of the Corps, EPA, and Fish & Wildlife on several occasions in efforts to ensure that Waste Management's activities did not violate the Clean Water Act. Waste Management's Exs. A—D; Federal Defendants' Motion to Dismiss and accompanying affidavits.

17. The Corps and EPA have made a determination in this case that they do not have the legal jurisdiction or authority to require a permit where the only activity conducted on a legally-designated wetland is draining or dewatering. Transcript of Conference on Application for Temporary Restraining Order, April 3, 1990, pp. 10, 13–14, 23; Affidavit of Wayne A. Lea, Federal Defendants' Motion to Dismiss; Affidavit of Norm Thomas, Federal Defendants' Motion to Dismiss; Exhibits B, C, & D, Waste Management's Response.

18. Waste Management has not sought or applied for any permit to authorize its draining activities. Complaint ¶ 47.

19. Plaintiffs filed a notice of intent to sue pursuant to 33 U.S.C. § 1365(b) on January 22, 1990, more than sixty-days before filing the current application before the Court. Complaint ¶ 14.

## III. CONCLUSIONS OF LAW

### A. *Jurisdiction and Standard of Review.*

 Jurisdiction of the Court is pursuant to the citizen suit provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1).[2] Section 1365(a)(1) allows a private right of action against persons allegedly violating certain provisions of the CWA. The Court also possesses jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704 ("APA"), which provides judicial review to a party adversely affected or aggrieved by final agency

---

**2.** 33 U.S.C. § 1365(a)(1) provides in relevant part:

Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person ... alleged to be in violation of (A) an effluent standard or limitation under this chapter....

Plaintiffs also seek relief under § 1365(a)(2), which provides a cause of action against the Corps or EPA where there is alleged a failure to perform a non-discretionary act or duty. However, enforcement of the CWA 404(b) permit requirement has been held to be discretionary and thus no basis for subject matter jurisdiction exists under this provision. *Sierra Club v. Train,* 557 F.2d 485 (5th Cir.1977); *Dubois v. Thomas,* 820 F.2d 943 (8th Cir.1987).

action, and 28 U.S.C. §§ 2201, 2202 which provide jurisdiction for a declaratory judgment proceeding.

■ The Corps and EPA have made a determination in this case that they do not have the legal jurisdiction or authority to require a § 404(b) permit where the only activity conducted on a legally-designated wetland is drainage. *See* Courts' Finding of Fact #17.[3] This determination constitutes final agency action under the CWA subject to this Court's review. 5 U.S.C. §§ 702, 704; *National Wildlife Federation v. Laubscher*, 662 F.Supp. 548, 550 (S.D. Tex.1987) (determination by Corps based on an alleged incorrect interpretation of statutory language and regulations subject to judicial scrutiny).[4]

■ Empowered to review the Corps' determination, the Court must abide by the deferential standards defined in 5 U.S.C. § 706(2)(A), (B), (C), and (D). These provisions require the Court to set aside findings, conclusions, and actions of an agency that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, or that fail to meet statutory, procedural or constitutional requirements. *Avoyelles III, supra*, 715 F.2d at 904 (reviewing Corps determination pursuant to the CWA).

### B. *Standing.*

■ Plaintiffs, a Texas city and a citizens association, each assert standing as "representational organizations" in this cause pursuant to the citizen's suit provisions of the CWA, 33 U.S.C. § 1365(a)(1). To establish standing under the APA, Plaintiffs must satisfy the aggrieved party standard of that Act, 5 U.S.C. § 702. *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 639 (5th Cir.1983), *reh'g. denied*, 718 F.2d 1096.[5] To establish representational standing, the Plaintiff groups must also show (1) its members would otherwise have standing to sue in their own right; (b) the interests they seek to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Save Our Wetlands, supra*, 711 F.2d at 639.

■ Standing under 5 U.S.C. § 702 requires that the aggrieved party suffer an "injury-in-fact," and that the alleged injury arguably falls within the zone of interests protected or regulated by the relevant statute. *Id.* In the context of the CWA, such injury can be shown where a representational group's member demonstrates a threat to a health-related, economic, recreational, aesthetic or environmental interest. *See, e.g., Sierra Club v. SCM Corp.*, 747 F.2d 99, 107 (2d Cir.1984); *Student Public Interest Research Group, Inc. v. Jersey Central Power*, 24 Env't Rep. Cas. (BNA) 1627, 1630 (D.N.J.1986); *cf. Save Our Wetlands*, 711 F.2d at 639 (same for suit under Rivers and Harbors Act).[6]

---

**3.** *Cf. Leslie Salt Co. v. United States*, 660 F.Supp. 183 (N.D.Cal.1987), *rev'd on other grounds*, 896 F.2d 354 (9th Cir.1990) (Corps conducts its own investigation and makes determination without formal hearing under § 404(b) permit process).

**4.** *See also Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 906 (5th Cir.1983) ("*Avoyelles III*") (Corps' wetlands determination requiring 404(b) permit subject to limited judicial review); *Golden Gate Audubon Soc'y v. United States Army Corps of Engineers*, 700 F.Supp. 1549, *withdrawn*, 717 F.Supp. 1417, 1419 (N.D. Cal.1988) (where court has jurisdiction over enforcement cause of action pursuant to 33 U.S.C. § 1365(a)(1) court also possesses jurisdiction to review "all pertinent issues necessary for adjudicating that cause of action" including Corps determination that § 404(b) permit was unnecessary for certain activities).

**5.** A "citizen" is a person or persons having an interest which is or may be adversely affected. 33 U.S.C. § 1365(g).

**6.** *See also United States v. Metropolitan St. Louis Sewer Dist.*, 874 F.2d 588, 590 (8th Cir.1989) (group standing conferred where two of group's 25,000 members alleged to visit, cross, and frequently observe river), *op. withdrawn, substituted op.* 883 F.2d 54; *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1113 (4th Cir.1988) (injury to aesthetic and environmental interests sufficient where pollution would affect river along which group member hiked), *cert. denied,* —— U.S. ——, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989); *Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 61 (2d Cir.1985) (pollution in river offended aesthetic values thus creating injury to member of plaintiff organization); *New York Public Interest Research Group, Inc. v. Limco Mfg. Corp.*, 697 F.Supp. 608, 611 (E.D.N.Y.

### 1. Save Our Community.

■ The Court finds that Plaintiff Save Our Community has established the requisite injury. SOC member James Douglas has observed the wetlands for nearly forty years, and has seen the wetlands used by various migratory birds. Douglas Aff. ¶ 2. As a resident of Ferris, his property is situated near the wetlands. *Id.* at ¶¶ 2, 3. Like other members of SOC, he has been able to enjoy the "wildlife, aesthetics, open space, ecolog[y]" and other values provided by the wetland. Complaint at ¶ 19.[7]

Furthermore, the interests that Plaintiffs SOC alleges to be injured clearly fall within the zone of interests that the Clean Water Act and its regulations seek to protect. *See infra* at pp. 611–615 (discussing purpose of CWA). SOC has established that it is an aggrieved party and that its members would otherwise have standing to sue in their own right.

The Court also finds that the interests SOC seeks to protect are germane to the organization's purpose. SOC is an association organized and existing to oppose expansion of the Skyline Landfill for purposes of, *inter alia,* promoting the protection of the wetlands in and around the community. Court's Finding of Fact # 1.

Neither the claim asserted by SOC under the CWA nor the relief requested necessitates the participation in this suit by the organization's individual members. Any aggrieved party may prosecute under the citizen suit provision of the CWA to protect its interests, and the issuance of a preliminary or permanent injunction need not involve any of the SOC members.

Because SOC alleges injury to legitimate interests that are reasonably within the purview of the CWA, and because SOC has successfully met the criteria for representational standing, the Court finds SOC to have standing to pursue this action.

### 2. City of Ferris.

■ The City of Ferris is not an appropriate party to this suit. The City is a general purpose unit of government organized as a municipal corporation. Court's Finding of Fact # 2. The multifarious services that the City provides for its residents do not align the City's mission closely enough with the particular interests asserted. The Court thus finds that the interests the City seeks to protect are not sufficiently germane to its purpose, i.e., to provide a local system of government for those residing in its jurisdiction. The City of Ferris cannot meet the representational standing criteria and cannot be afforded injunctive relief.

### C. *Draining is a Regulated Activity under Section 404(b) of the Clean Water Act.*

■ Save Our Community presents the Court with the following question: should "draining" or "dewatering" a wetlands be considered a regulated activity within the meaning of § 404(b), 33 U.S.C. § 1344, of the Clean Water Act? The Court holds that under the Clean Water Act, its regulations, and relevant case law draining is indeed a regulated activity under § 404(b) and requires a permit where such activity presents the threat of significant alteration or destruction of a wetland.

### 1. Clean Water Act.

The relevant provisions of the Clean Water Act of 1977 originated in the Federal Water Pollution Control Act Amendments, 33 U.S.C. § 1251 *et seq.* ("FWPCA"), enacted in 1972. These provisions prohibit the discharge of dredged or fill materials into regulated waters unless authorized by a permit issued by the United States Army Corps of Engineers. 33 U.S.C. § 1344 ("Section 404(b) permit"); *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 123, 106 S.Ct. 455, 457, 88 L.Ed.2d 419

---

1987) (group standing where complaint alleged members reside or own property in or near harbor, where two members use harbor for boating, and where depreciation in property values might result from inability to use harbor).

7. The fact that the wetlands are on private property does not diminish these interests. *Hanson v. United States,* 710 F.Supp. 1105, 1108 (E.D. Tex.1989).

(1985). Express congressional and agency decisions in recent years have expanded the definition of regulated waters to cover wetlands. *See Bayview Homes,* 106 S.Ct. at 458.

A § 404(b) permit application requires the Corps to conduct a review of the proposed activity with an eye towards the public interest. The general policies guiding this review mandate an evaluation of the environmental impact on the affected water bodies. *See* 33 C.F.R. § 320.4 (1989). Specific guidelines issued by the EPA governing a § 404(b) review require an indepth environmental analysis and express a preference for alternative sites where practicable. 40 C.F.R. § 230 *et seq.*

Congress intended an expansive reach for the § 404(b) permit requirement. As the Supreme Court understood the program's purpose:

> Section 404 originated as part of a comprehensive legislative attempt to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101, 33 U.S.C. § 1251. **This objective incorporated a broad, systemic view of the goal of maintaining and improving water quality: as the House Report on the legislation put it, "the word 'integrity' ... refers to a condition in which the natural structure and function of ecosystems is [are] maintained."** H.R.Rep. No. 92–911, p. 76 (1972).

*Bayview Homes,* 106 S.Ct. at 462 (emphasis added).[8] Congress' intent was evident: "A basic policy of the FWPCA is the protection of our nation's wetlands and the important functions they serve. The legislative history of the Clean Water Act ... reflects an abiding congressional concern with the **functional importance of wetlands."** *Avoyelles Sportsmen's League v. Alexander,* 473 F.Supp. 525, 533 (W.D.La.1979) (*"Avoyelles I"), later proceeding,* 511 F.Supp. 278 (W.D.La.1981) (*"Avoyelles II"), aff'd in part & rev'd in part, Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897 (5th Cir.1983) (*"Avoyelles III"*) (emphasis added).[9]

Thus it has been recognized that Congress devised the § 404(b) program to control the degradation of aquatic resources that results both from the replacement of protected water with fill material and from the discharge of dredge or fill material containing toxic substances. *Bayou Des Familles Dev. Corp. v. United States Corps of Engineers,* 541 F.Supp. 1025, 1036 (E.D.La.1982). To conduct activity on a protected wetland that might pose a threat to its integrity, a party must first procure a § 404(b) permit.

### 2. Regulatory Guidelines.

The regulations issued by the Corps and EPA evidence an obvious principle of wetland protection. *See* 33 C.F.R. § 320.4(b)(1) ("most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest"); 33 C.F.R. § 323.4(a)(1)(iii)(C)(2) (limited exceptions to § 404(b) do not exempt activities involving "drainage associated with the immediate or gradual conversion of a wetland to a non-wetland").[10] The degradation or destruction of valuable aquatic sites like wetlands is "among the most severe environmental impacts covered by" these regulations and

---

**8.** *See also id.* (discussing "the evident breadth of congressional concern for protection of water quality and aquatic ecosystems.").

**9.** Citing remarks of Sen. Stafford in the *Legislative History of the Clean Water Act of 1977* 881–82:

> The lasting benefits that society derives from coastal and inland wetlands often far exceed the immediate advantage their owners might get from draining or filling them; we are losing wetlands at the rate of some 300,000 acres per year.

**10.** *See also* 33 C.F.R. § 323.4(c) (implementing limitation clause on exemptions to § 404(b): "any [exempt activity] must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States [may] be impaired or the reach of such waters reduced.... A conversion of a section 404 wetland to a non-wetland is a change in use of an area of the waters of the United States.").

may represent "an irreversible loss of valuable aquatic resources." 40 C.F.R. § 230.1(d).

### 3. Is a "Discharge" Required? [11]

Much of the debate over the scope of § 404(b) has centered on whether the particular activity challenged involves a discharge of dredged or fill material into a protected water body. Indeed, the Act and its accompanying regulations are reasonably interpreted as focusing primarily on discharges. *See, e.g.,* 40 C.F.R. § 230.2(a). As Waste Management points out few, if any, cases have focused exclusively on the issue of draining wetlands. This is understandable given the unusual situation, as here, where a landowner is capable of completely draining a water body sited on property that has also been legally designated a wetland by the Corps of Engineers.[12]

### 4. Relevant Case Law.

■ However, significant case law indicates that activities which will significantly alter or destroy a wetland require a permit from the Corps. Some of the leading cases supporting this interpretation of the Act have come from the Fifth Circuit Court of Appeals. Other courts have grappled with this issue and have expressed similar views concerning the types of activity that § 404(b) governs.

In *Avoyelles Sportsmen's League, Inc. v. Marsh, supra,* ("*Avoyelles III*"), the Fifth Circuit upheld the district court's determination that certain landclearing activities in the Red River backwaters of Louisiana required a § 404(b) permit. The dis-

trict court in that case ruled that permanent removal of trees and vegetation as part of a conversion to agricultural land, even though not necessarily involving a discharge, was subject to § 404(b) requirements.[13] *Avoyelles Sportsmen's League v. Alexander, supra,* 473 F.Supp. at 532–35 ("*Avoyelles I*"). The Fifth Circuit affirmed that the landclearing activities required a permit, but on a narrower ground. The district court's findings demonstrated that the landclearing activities also involved the redepositing of some materials within the wetlands. The *Avoyelles III* panel concluded that burial of waste material in this situation constituted a discharge of fill subject to the permitting regulations. *Avoyelles III,* 715 F.2d at 923–24. Therefore, the district court's holding that "discharge" covered removal of the vegetation without a redepositing was considered "pure dicta." *Id.* at 923.

In reaching this result, the Fifth Circuit expressed its understanding of the legislative history and policies behind the Clean Water Act. While discussing the CWA's jurisdictional reach, the Court quoted the remarks of one of the Act's primary sponsors, Sen. Muskie: "The unregulated destruction of [wetlands] is a matter which needs to be corrected and which implementation of § 404 has attempted to achieve." *Id.* at 915 (quoting legislative history). The Fifth Circuit thus indicated its alignment with the expansive reading subsequently given to the Act by the Supreme Court in *Bayview Homes, supra.*

More significantly, the *Avoyelles III* court reaffirmed its view, expressed in an

---

**11.** Plaintiffs assert, and Waste Management disputes, that Waste Management has discharged some fill material into the ponds in the course of draining them. In support, Plaintiffs cite correspondence from Fish & Wildlife. Plaintiffs' Exs. L, N; Waste Management's Ex. E. Because the Court decides that the draining activities in this case require a § 404(b) permit, it need not rule on the issue of whether a *de minimis* discharge requires a permit. The Fifth Circuit in *Avoyelles III* indicated that, where *de minimis* discharges occur, the proper course is for the Corps to grant a general permit and not to refuse to exercise jurisdiction. *See Avoyelles III,* 715 F.2d at 919 n. 37; *Reid v. Marsh,* 20 Env't Rep. Cas. (BNA) 1337, 1342 (N.D. Ohio

1984); *but see* 33 C.F.R. § 323.3(d) (discharge of dredged material "does not include *de minimis* incidental soil movement occurring during normal dredging operations").

**12.** The fact that these wetlands were artificially-created does not affect the Corps' jurisdiction. *Leslie Salt Co. v. United States,* 896 F.2d 354, 358 (9th Cir.1990) (citing cases).

**13.** As part of its findings, the district court stated that the wetland's natural drainage characteristics would be significantly impacted by the landclearing activities, resulting in increased runoff and drainage. 473 F.Supp. at 534.

earlier decision, that activities which significantly change the character of a wetland are subject to permitting. In *Save Our Wetlands, Inc. v. Sands, supra,* the same panel of the Fifth Circuit held that certain landclearing activities did not require application of the § 404(b) process. To explain why the limited landclearing in *Save Our Wetlands* was not a regulated activity, the court drew a comparison to the extensive wetland destruction in *Avoyelles I*:

> The work in *Avoyelles [I]* was intended to permanently change the area from wetlands into a non-wetland agricultural tract.... All timber and vegetation were to be cut and cleared. The area was to be drained and levelled.... **One of the key elements behind [the ; *Avoyelles I* ] decision was the fact that the work would destroy the wetlands.**
> ... The wetlands involved here **will not be converted as in *Avoyelles*.**

*Save Our Wetlands,* 711 F.2d at 647 (emphasis added).[14] Later, in *Avoyelles III,* the Fifth Circuit reemphasized the importance of the nature of wetland alteration in determining the scope of regulated activity. 715 F.2d at 926 n. 46, 927.[15]

Other courts consider the destructive impact of drainage on a wetland critical. *See,*

**14.** Unlike that in *Avoyelles I, see supra* n. 13, the landclearing at issue in *Save Our Wetlands* did not materially affect drainage patterns of the relevant wetlands. *See* 711 F.2d at 638 n. 4.

**15.** That the Fifth Circuit may now consider all significant landclearing activities to be subject to § 404(b) permitting, without regard to an actual discharge, is indicated by *Louisiana Wildlife Federation, Inc. v. York,* 761 F.2d 1044 (5th Cir.1985) (per curiam) (flood control and drainage project required construction of levees and other "drainage works"). In *York* the court found it necessary to describe the history and impact of the *Avoyelles* litigation, and determined that in *Avoyelles III* "the Fifth Circuit agreed that a private landowner's clearing of wetlands for agricultural use is subject to the permit requirements of the Corps of Engineers under Section 404 of the Clean Water Act." *Id.* at 1050 (citing *Avoyelles III,* 715 F.2d at 920–22).

**16.** On appeal, the Fifth Circuit did not rule on the merits of the flood control decision but instead remanded the case because the Corps' modification order had failed to consider a statutory requirement regarding funding of the project. *Creppel, supra,* 670 F.2d at 574. The

*e.g., Creppel v. United States Army Corps of Engineers,* 500 F.Supp. 1108 (E.D.La. 1980), *rev'd on other grounds,* 670 F.2d 564 (5th Cir.1982). In *Creppel* the district court affirmed the finding of the Corps and the EPA that a permit proceeding was necessary where a proposed land reclamation project would wreak destruction on a wetland through closure of a canal and the operation of a pumping station. *Id.* at 1114–15. The court accepted these agencies' interpretation of § 404 as an "environmental protection statute" and described this interpretation as "reasonable and consistent with the Congressional purpose" behind the CWA. *Id.* at 1115.[16] *See also Leslie Salt Co. v. United States,* 896 F.2d 354 (9th Cir.1990) (court upheld Corps' determination that property was a regulated wetland and upheld Corps' cease and desist order requiring landowner to obtain permit before draining and filling the wetland); *United States v. Akers,* 785 F.2d 814, 822 (9th Cir.) (upholding cease and desist injunction against farmer who graded, levelled and drained property to expand farming; "The intent of Congress in enacting the [CWA] was to prevent conversion of wetlands to dry lands."), *cert. denied,* 479 U.S. 828, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986).[17]

Fifth Circuit did state that the Corps' modification order was not otherwise arbitrary or capricious. *Id.* at 573–75.

**17.** *Cf. Buttrey v.` United States,* 690 F.2d 1170, 1180 (5th Cir.1982) ("[I]t would hardly be putting the case too strongly to say that the Clean Water Act and the applicable regulations do not contemplate that wetlands will be destroyed simply because it is more convenient than not to do so."), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983).

A different understanding of this issue is not dictated by the Fifth Circuit panel's discussion in *Orleans Audubon Soc'y v. Lee,* 742 F.2d 901 (5th Cir.1984), *reh'g. denied,* 750 F.2d 69 (5th Cir.1984) (en banc), in which the court held that installation of two drainage culverts on a wetlands area did not require a permit because no discharges occurred from the water diversion. In a footnote, the court stated:

> Orleans has also argued the drainage of water from the CIT tract is prohibited by § 404(f)(2) of the CWA.... Orleans contends that the drainage is prohibited ... because it is incidental to an activity which is intended to bring about the conversion of a wetland into a

**5. Undermining the Act.**

As discussed above, the Clean Water Act and its regulations exhibit a strong policy of wetlands preservation. Congress devised § 404 to ensure that significant alterations to the nation's wetlands were not undertaken without an evaluation by the Corps and the EPA. It would seem to stand logic on its head, then, to permit a landowner to avoid the § 404(b) process by completely draining a wetland and then claiming "Permit for what wetland?" That Congress did not intend the Clean Water Act to serve landowners as both a sword to eliminate wetlands through draining and a shield to then avoid a § 404(b) permit is quite clear.

The court in *Golden Gate Audubon Society v. United States Army Corps of Engineers, supra,* addressed this very paradox. In that case the court held that a regulation exempting from Corps jurisdiction areas that were once wetlands, but which had been transformed to another use, applied only to wetlands converted before 1975.[18] "Without this temporal limitation," the court held, "a developer could surreptitiously fill a site to destroy jurisdiction, and then avail itself of this "conversion" exemption from the permit requirement. *Id.* at 1421. Similarly, to allow the draining of ponds and the redetermination of the site as a non-wetland would "permit the very evil that the regulation is intended to prevent: the destruction of wetlands to eliminate the permit requirement." *Id.* This paradox appears even more incredulous when the purpose of draining the ponds is to ultimately *fill* them with earth and refuse (as Waste Management plans to do), an activity that the parties unanimously agree would require a § 404(b) permit had Waste Management simply deposited the fill into the ponds instead of draining them first![19]

The Court holds as a matter of law that pursuant to the Clean Water Act, its regulations, and relevant case law § 404(b) of the Act requires a permit where draining a wetland presents the threat of significant alteration or destruction of the wetland.

■■■ There is no doubt that Waste Management has significantly drained the ponds, and intends to continue to pump them and destroy their retention capacity to the point of complete evaporation and the extinction of plant and animal life. This activity presents a clear violation of the permit requirements of § 404(b) of the Clean Water Act. The determination, action, finding, and conclusion by the Corps and EPA that § 404(b) does not regulate this activity is not in accordance with the law and is short of statutory right as provided by the Clean Water Act. 5 U.S.C. § 706.[20]

non-wetland area which can then be developed into a residential area without governmental approval. Although we are fully aware of this possibility, as is the Corps, we cannot require the Corps to exercise a jurisdiction it does not possess. Section 404(f)(2) applies *only* when dredged or fill material has been discharged, and water is simply not dredged or fill material. Orleans bald assertion that vegetation from the tract (which, it argues, constitutes a pollutant) is also being removed through the culverts is not supported by the record.
*Id.* at 910 n. 16 (emphasis in original). The Court understands the discussion contained in this footnote to mean only that the Corps cannot require a permit when water is the only material *discharged* into a wetlands area. This understanding is consistent with the fact that the court restricted its discussion to the limiting clause of § 404(f), which provides for very narrow exceptions to the permit requirement. *See Avoyelles III,* 715 F.2d at 926 (§ 404(f) provides a narrow exemption for enumerated activities so long as they have "little or no adverse effect on the nation's waters."). The *Orleans* court's brief analysis cannot be understood to mean that the Act permits the wanton destruction of wetlands through draining activities. However, to the extent that *Orleans* conflicts with *Avoyelles III, Save Our Wetlands,* and *York,* this Court follows the path cleared by the latter decisions.

**18.** The Court cited this date as the starting point for Corps jurisdiction over wetlands adjacent to navigable waters. *Id.* at 1421.

**19.** *See* letters from the Corps, EPA, and Fish & Wildlife soliciting 404(b) permit in case of contemplated discharge. Plaintiffs' Exs. D, F, L.

**20.** Waste Management's proposed mitigation plan that would create an alternative wetland site as part of its landfill expansion is not a substitute for the § 404 permitting process. *See* 33 C.F.R. § 320.4(r) n. 1 (1989). In fact, the EPA's § 404(b) guidelines express a preference

## IV. REMEDY

 Plaintiffs seek a preliminary injunction. In order for the Court to grant this relief, Plaintiffs must show:

 (a) a substantial likelihood of success on the merits;

 (b) a substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted;

 (c) that the threatened injury to the Plaintiffs outweighs the damage that an injunction might cause to Defendants; and

 (d) that the injunction will not disserve the public interest.

*Mississippi Women's Medical Clinic v. McMillan*, 866 F.2d 788, 790–91 (5th Cir. 1989) (citing *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974)).

### A. There is a Substantial Likelihood Plaintiff Will Succeed on the Merits.

The Court has jurisdiction to review the Corps and EPA's determinations under the Clean Water Act, 33 U.S.C. § 1344, subject to the standards of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* Plaintiff Save Our Community has demonstrated the requisite injury-in-fact and representational status to achieve standing to pursue an alleged violation of § 404(b) of the CWA under the citizen suit provision, 33 U.S.C. § 1365(a) and the aggrieved party standard of the APA, 5 U.S.C. § 702.

The Corps and the EPA in 1987 made a jurisdictional determination that the ponds in question are waters of the United States, *i.e.* wetlands, subject to the permitting requirements of § 404(b). The Corps and EPA have now determined that they do not have the authority to regulate draining, dewatering, or pumping activity pursuant to § 404(b). As discussed, the Court believes that a fundamental purpose of the Clean Water Act would be defeated if the Corps could not review activities which may significantly alter or destroy a protected wetland. Waste Management's activi-

ties in this instance have significantly altered the wetlands, and if continued, will certainly destroy them. Accordingly, Plaintiff SOC has demonstrated a substantial likelihood of success on the merits.

### B. Plaintiff Will Suffer Irreparable Injury If the Injunction is not Granted

Preserving the status quo is essential in this dispute. The continued drainage and evaporation of the ponds creates a real and immediate harm to the recreational, aesthetic, environmental and economic interests of Plaintiff. Plaintiff cannot obtain meaningful relief if it ultimately prevails on the merits but the ponds are drained dry and plant and animal life is extinguished. *See Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 561 (5th Cir.1987). "When the opportunity to adequately review environmental factors is lost, the harm becomes irreparable and an injunction is necessary to preserve the decision-making process." *Association Concerned About Tomorrow, Inc. v. Dole*, 610 F.Supp. 1101, 1119 (N.D.Tex.1985) (National Environmental Policy Act). The harm Plaintiff will suffer should Waste Management's alterations to the wetlands continue will be irreparable.

### C. The Harm to Plaintiff Outweighs Any Damage to Defendants.

The concrete harm to Defendant Waste Management is created by the necessity to seek a § 404(b) permit. Other harm to Waste Management appears speculative. Waste Management asserts that the Skyline Landfill will reach fill capacity by 1992. Should a state administrative hearing concerning the proposed expansion be delayed because of *this* Court's grant of a preliminary injunction, then Waste Management argues that it may not be able to secure a slot on the Texas Department of Health's crowded docket in time to obtain the necessary permit. If this occurs and the landfill reaches its capacity as stated, Waste

---

for alternative, upland sites before a permit is granted. *See* 40 C.F.R. § 230.10(a) (1989). "'[T]hese guidelines couple a general presumption against all discharges into aquatic ecosys-

tems with a specific presumption that practicable alternatives to the fill of wetlands exist.'" *York, supra,* 761 F.2d at 1047 (citing *Hough v. Marsh,* 557 F.Supp. 74, 82 (D.Mass.1982)).

Management would then be forced to cease operations, subjecting it to losses of $10,000 per day.

Even if this hypothetical series of events materializes, money cannot replace the loss of the wetlands as they exist. The concrete harm to the wetlands and Plaintiff's interests therein substantially outweigh the measurable harm to Waste Management.

No harm will come to the Corps or EPA if they are required to carry out statutorily-prescribed duties pursuant to the § 404(b) process. The harm to the wetlands and Plaintiff's interests therein substantially outweigh the absence of harm to the Federal Defendants.

### D. *The Injunction Will Not Disserve the Public Interest*

The Clean Water Act's expressed concern for wetlands indicates the strong public interest at stake in their preservation and maintenance. *See supra* pp. 611–615 (discussing CWA's purpose and policies). Draining, filling, or any other destruction of wetlands must be carefully considered. The § 404(b) permitting requirement serves just this purpose. Requiring Waste Management to procure a permit before any further drainage of the wetlands will serve the public interest. Requiring the Corps and the EPA to evaluate the proposed wetlands alterations through the carefully prescribed § 404(b) procedures will improve the public's confidence in these agencies' ability to fulfill their legislated duties.

Accordingly, Plaintiff SOC has demonstrated entitlement to preliminary injunctive relief.

### V. CONCLUSION

It is ORDERED AND ADJUDGED that Defendant Trinity Valley Reclamation, Inc., a wholly-owned subsidiary of Waste Management of North America, Inc., their officers, agents, servants, employees and attorneys, and any other persons in active concert or participation with them who receive actual notice of this injunction by personal service or otherwise are enjoined from draining, dredging, building on, discharging into or otherwise altering, by any means, the seven ponds classified as wetlands, located on the north side of the City of Ferris, Texas, bound on the east by U.S. Highway 75 on approximately 267 acres for the planned expansion of the Skyline Landfill. The geographic description is as follows: Lat: 32° 32′ 50″ Long: 96° 40′ 15″. The injunction shall continue in effect unless and until Trinity procures a § 404(b) permit from the Corps for the activities listed above, or until the entry of final judgment or until further order of this Court. The Court believes that, in light of its ruling, the Corps and the EPA will carry out their duty to make a determination under § 404(b); the Court therefore does not grant injunctive relief against the Corps or the EPA. The Federal Defendants' Motion for Summary Judgment is DENIED. Relief sought and not granted is DENIED.

SO ORDERED.