United States Court of Appeals,

Fifth Circuit.

No. 91–7012.

Save Our Community, et al., Plaintiffs,

SAVE OUR COMMUNITY, Plaintiff–Appellee,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants–Appellants.

Sept. 14, 1992.

Appeals from the United States District Court for the Northern District of Texas.

Before POLITZ, Chief Judge, and DUHÉ, Circuit Judge.[*]*

R CURIAM:

Appellee, Save Our Community ("SOC"),[1] brought suit challenging the draining of several ponds on the site of a proposed expansion of a 73–acre landfill (the "Skyline Landfill") near the City of Ferris, Texas, operated by appellant Trinity Valley Reclamation, Inc. (collectively "Trinity").[2] SOC[3] sought a preliminary injunction and a declaratory judgment that Trinity violated the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.,* by failing to obtain a permit pursuant to section 404

[*]Decided by a quorum, 28 U.S.C. § 46(d). Judge Jerre Williams heard argument as a member of the panel but subsequently recused.

[1]This case originally proceeded on behalf of SOC and the City of Ferris. In the district court's grant of the application for preliminary injunction, the court found that while SOC had standing, the City of Ferris was not an appropriate party to the suit. *Save Our Community v. EPA,* 741 F.Supp. 605, 611 (N.D.Tex.1990).

[2]Trinity Valley Reclamation, Inc., is a wholly-owned subsidiary of Waste Management of North America, Inc., which is in turn a wholly-owned subsidiary of Waste Management, Inc. In the proceedings below, the Waste Management entities were collectively referred to as Waste Management by both SOC and the court. However, because the Waste Management entities refers to themselves as Trinity on appeal, to alleviate confusion, we likewise do so.

[3]SOC is an unincorporated association of individuals organized and existing to oppose expansion of the Skyline landfill. Members of SOC reside in the cities of Ferris, Dallas, and Palmer, and in rural areas in Ellis and Dallas Counties. SOC seeks to promote the protection of the wetlands in and around its members' communities. SOC's members assert that they enjoy the wildlife, aesthetics, open space, ecological and other values of the wetlands, which have been and may or will be drained and/or filled, and are directly and beneficially interested in the continued protection, preservation, and enhancement of these values.

of the Act before starting to drain the ponds. SOC also sought a declaration that appellants the United States Army Corps of Engineers ("Corps") and the United States Environmental Protection Agency ("EPA") (collectively "Federal defendants") either failed to perform a duty to enforce section 404 provisions or incorrectly interpreted the CWA by determining that draining is not a regulated activity under the Act. The district court held as a matter of law that the draining activity required a permit. It issued a permanent injunction. We reverse.

## I. FACTS

Trinity owns and operates the Skyline Landfill located near Ferris, Texas. In contemplation of expanding the landfill to encompass a total area of 340 acres, Trinity solicited an opinion from the Corps in May of 1987 as to whether the Corps had jurisdiction over any portion of the proposed expansion area as constituting waters of the United States. The area included seven man-made ponds. The Corps determined these ponds were waters of the United States, and, as such, were protected under the CWA. The EPA subsequently sent a letter to Trinity concurring in the Corps' determination and advising it of the need for a permit if any discharge into these ponds was contemplated.[4]

Since filling the ponds with landfill would violate the CWA, Trinity began draining the ponds by the use of a mechanical pump, utilizing the water extracted to irrigate the sod covering areas of

---

[4]The Corps and the EPA jointly administer the CWA section 404 regulatory program. The CWA confers broad authority to the Corps and the EPA to regulate activities involving a discharge of dredged or fill material into the nation's waters, including wetlands. 57 Fed.Reg. 26894 (1992) (to be codified at 33 C.F.R. pts. 323 & 328 and 40 C.F.R. pts. 110, 112, 116, 117, 122, 230, 232, and 401) (proposed June 16, 1992). Under the Memorandum of Agreement between the EPA and the Corps delineating jurisdictional authority under the CWA with regard to standard permit applications, the Corps makes most of the jurisdiction decisions though it must abide by EPA guidance. A tracking system is also provided whereby the Corps supplies the EPA with a record of all its jurisdictional determinations to enable the EPA to review decisions. *See Memorandum of Agreement Between the Department of the Army and the Environmental Protection Agency Concerning the Determination of the Geographic Jurisdiction of the Section 404 Program and the Application of the Exemptions Under Section 404(f) of the Clean Water Act* (Jan. 19, 1989).

the existing landfill.[5] According to Trinity, maintaining a proper sod cover over the existing landfill necessitated irrigation, and the ponds provided the only water available in the area. Moreover, Trinity, as well as the Corps, expressed a concern that the rubble dams creating the ponds were unstable, and thus were a risk to public safety, further necessitating the removal of water from the ponds. More important, Trinity planned to drain the ponds and utilize these areas for landfill purposes.[6] Unsure whether this pumping activity would ever fully drain the ponds, Trinity asserts, and the Corps concurs, that Trinity subsequently would seek another determination from the Corps as to whether these drained areas still constituted waters of the United States prior to utilizing the areas for landfill purposes.[7]

---

[5]According to a recent commentary, draining a wetland without attaining a section 404 permit has emerged as a common vehicle to destroy wetlands. Comment, *Pumping With the Intent to Kill: Evading Wetlands Jurisdiction Under Section 404 of the Clean Water Act Through Draining,* 40 DePaul L.Rev. 1059, 1080 (1991). In essence, the draining is accomplished, as in the instant case, through the installation and use of a mechanical pump or other dewatering device. Consequently, the water is drained out of the wetland, destroying the water, soil, and vegetation conditions necessary to characterize the area as "waters of the United States," subject to protection by the CWA.

[6]After Trinity was advised that the ponds, in their present condition, were jurisdictional waters fringed with wetlands, Trinity met with officials from the Corps, the EPA, and the Fish and Wildlife Service (FWS) on several occasions to discuss Trinity's plans to drain these ponds. All three agencies advised Trinity that no permit was required for Trinity's draining activities as long as Trinity did not discharge any pollutants into any jurisdictional waters of the United States.

> Trinity maintains that it is committed to wetlands protection and preservation. It is cognizant that its plan to de-water the ponds will result in some loss of wetland habitat (arguably all), and, consequently, has sought voluntarily to propose to replace the ponds with a high-quality wetlands wildlife habitat elsewhere on Trinity's property in an area adjacent to Ten Mile Creek. Trinity has submitted its proposed Wetlands Development Plan to the Corps, the EPA, and the FWS for their review and comment. According to Trinity, it has been verbally advised by representatives from these agencies that the new proposed wetlands wildlife habitat "will be superior to the existing water-filled pits [ponds]."

[7]On May 30, 1991, Trinity applied to the Corps for a permit for the draining of the ponds at issue in the instant case, the destruction and removal of the rubble dams, and the creation of new replacement wetlands elsewhere. The permit application anticipates that the discharge of "dredged or fill material for this project will included discharges resulting from the pumping of water, removal of the rubble dams and dredging of the benthic soils from existing impoundments A–F."

> According to the Federal defendants, though the SOC, the amici curiae, the Environmental Defense Fund ("EDF") and National Wildlife Federation ("NWF") appear to take the application as an indication that the draining of the ponds requires a permit, the

During the course of this pumping operation, the result of which had lowered the surface area of the ponds down from 20 to 10 acres, Trinity, in January 1989, applied to the Texas Department of Health ("TDH") for a permit to expand the Skyline Landfill from 73 acres to 340.399 acres. The TDH referred along the application to the Fish and Wildlife Service of the United States Department of the Interior (FWS) for its review. FWS replied that there was "an apparent attempt to circumvent the regulations" on the part of Trinity, and recommended that "in the interest of fish and wildlife resources and wetland conservation ... the permit application be denied." FWS expressed its concerns regarding the project, and reported that it "noted a variety of wildlife using the ponds on our on-site visit including leopard frogs, beaver, and various birds." FWS also drew Trinity's attention to the depositing of fill material occurring in one of the ponds.

On April 2, 1990, claiming that the draining activity required a permit from the Corps pursuant to Section 404 of the CWA, the City of Ferris and SOC filed their Original Complaint, Application for Temporary Restraining Order, and Application for Preliminary Injunction under the citizen suit provision of the CWA. They sought to enjoin the further removal of water from the ponds. The City of Ferris and SOC also asked for a declaration that the Corps and the EPA had either misinterpreted the CWA by concluding that Trinity did not require a section 404 permit to drain the ponds or had failed in their duties under section 404. The next day, citing the need to prevent further drainage of the ponds, the district court issued a TRO enjoining Trinity from draining or otherwise altering wetlands located on the Skyline Landfill property.[8]

---

application and notice do not support the inference. Although Trinity may drain the ponds without a permit if no discharge occurs, it would be easier for Trinity if the project would progress without the need to prevent discharges. Further, as Trinity also concedes, it is unclear whether Trinity will be able to drain the ponds completely or that the pond sites will cease to be wetlands regardless of Trinity's careful draining. Thus, the Corps suggests that it was wise to apply early for a permit.

[8]Ultimately, after a four-week hearing in April, and after voluminous post-hearing briefing by all parties, TDH denied Trinity's landfill expansion permit application on August 8, 1990. Trinity's motion for rehearing was denied on February 20, 1991.

In the weeks that followed, the EPA and the Corps filed a Motion to Dismiss arguing that no permit was required for Trinity's draining activity. Nonetheless, on May 3, 1990, the district court rendered it s decision in a published opinion,*Save Our Community v. EPA,* 741 F.Supp. 605, 617 (N.D.Tex.1990), enjoining Trinity from "draining, dredging, building on, discharging into or otherwise altering, by any means, the seven ponds classified as wetlands ... unless and until Trinity procures a § 404(b) permit from the Corps for the activities listed above, or until the entry of final judgment or until further order of this Court." Because it believed that, "in light of its ruling, the Corps and the EPA [would] carry out their duty to make a determination under § 404(b)," it refused to grant injunctive relief against the Corps or the EPA.

In reaching this conclusion, the district court engaged in a policy-based analysis of the CWA—its legislative history, regulatory guidelines issued pursuant to it, and particular language excised from cases applying it. Focusing nearly entirely on the clearly destructive aspects of Trinity's draining project, and offended by what it perceived to be a direct subterfuge of section 404 by permitting a landowner to drain a wetland and then claim "[p]ermit for what wetland?", the district court held:

> [A]s a matter of law that pursuant to the Clean Water Act, its regulations, and relevant case law § 404(b) of the Act requires a permit where draining a wetland presents the threat of significant alteration or destruction of the wetland.

741 F.Supp. at 615.

Despite a fact finding that "[s]ome minor discharges ha[d] occurred," and ignoring the urging of amici curiae—the Environmental Defense Fund and the National Wildlife Federation—to "consider a supplemental basis for its ruling that takes into account discharges," the district court refused to consider the issue of discharge in making its decision: "Because the Court decides that the draining activities in this case require a § 404(b) permit, it need not rule on the issue of whether a *de minimis* discharge requires a permit." *Id.* at 613 n. 11. Because the parties continued to refer to al leged

discharges in subsequent proceedings, the court continued to mention them. But it always found them irrelevant to its decision.

On June 13, 1990, SOC moved for summary judgment and a permanent injunction, claiming that no genuine disputed issue of fact remained following the district court's prior ruling. At this juncture, once again, Trinity and the Federal defendants contended that the district court lacked jurisdiction over the subject matter because Trinity's draining activity did not require a section 404 permit. The district court, however, found jurisdiction and awarded summary judgment and a permanent injunction. It ordered SOC attorney's fees be paid by Trinity as well as costs. The court asserted that if Trinity's activity is "viewed as a whole," it unquestionably requires a permit. According to the court, "[t]o divorce the drainage of the wetlands from their subsequent filling with waste matter is to be blinded by abstractions and to ignore the actual controversy between the parties."

On appeal, Trinity challenges the district court's ruling that draining activities that significantly alter wetlands require a section 404 permit. Trinity also takes issue with the district court's assessment of SOC's attorneys' fees, expenses, and court costs against it.

## II. DISCUSSION
### A. Standing[9]

---

[9]As a peripheral argument, SOC contends that the Federal defendants lack standing to appeal because the district court declined to grant relief against them. In order to have standing to appeal, a party must be aggrieved by the judicial action from which it appeals. *See Deposit Guaranty National Bank, Jackson, Mississippi v. Roper,* 445 U.S. 326, 333, 100 S.Ct. 1166, 1171, 63 L.Ed.2d 427 (1980). In response, the Federal defendants concede that they potentially lack standing to appeal. They contend, however, that since they side with Trinity who has the requisite standing, the matter is of little import. Second, they are entitled to appeal because they were party to the suit below. In any case, they conclude, they could always file their briefs as amicus curiae. *See* Fed.R.App.P. 29. Further, the Federal defendants assert that SOC's argument that the district court correctly determined that it had jurisdiction over the government (an issue not on appeal) is somewhat inconsistent with its argument that the district court's judgment is not binding on the government and therefore not appealable.

As a preliminary matter, Trinity challenges SOC's Article III standing to sue as seeking enforcement of the CWA under the Act's citizen suit provision.[10]  Standing analysis focuses upon "[w]hether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton,* 405 U.S. 727, 731, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972).  SOC seeks to represent the interests of its members.  Such "representational standing" is appropriate where:  "(a) its members would otherwise have standing to sue in their own right;  (b) the interests it seeks to protect are germane to the organization's purpose;  and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *O'Hair v. White,* 675 F.2d 680, 691 (5th Cir.1982) (en banc) (quoting *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)).

Trinity asserts that SOC's individual members lack standing to pursue this suit on their own; consequently, SOC as an organization lacks standing.  The Supreme Court in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), enunciated the requirements for individual standing:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered so me actual or threatened injury as a result of the putatively illegal conduct of the defendant," ... and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

In its complaint, SOC defined its *raison d'être* as "promoting the protection of the wetlands in and around their communities."  Further, SOC supported with affidavits the assertion that its members resided in the vicinity of, or owned property near the wetlands on the Skyline Landfill, and enjoyed "the wildlife, aesthetics, open space, ecological and other values of the wetlands, ... and [were] directly and beneficially interested in the continued protection, preservation, and enhancement of

Because the resolution of this issue has no bearing on the substantive case, we need not explore it further.

[10]The CWA confers standing to the limits of the Constitution.  Under the CWA, "any citizen may commence a civil action."  33 U.S.C. § 1365(a).  A "citizen" is "a person or persons having an interest which is or may be adversely affected." *Id.* § 1365(g).

these values."

We find that SOC has stated an injury sufficient to satisfy the first element of the standing requirement under *Valley Forge.* The Supreme Court held in *Morton,* 405 U.S. at 734–35, 92 S.Ct. at 1366, that harm to aesthetic, environmental, or recreational interests is sufficient to confer standing, provided that the party seeking review is among the injured. Further, as the Third Circuit recently acknowledged, "[t]hese injuries need not be large, an "identifiable trifle' will suffice." *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 71 (3rd Cir.1990) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973)), *cert. denied,* —— U.S. ——, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991).

As the district court noted, other Courts have consistently recognized this low threshold for sufficiency of injury. *See, e.g., United States v. Metropolitan St. Louis Sewer District (MSD),* 883 F.2d 54, 56 (8th Cir.1989) (conferring representative standing where two of the group's named members alleged that many of the 25,000 members have visited, crossed, and frequently observed the river, as well as periodically have used it for recreational purposes); *Sierra Club v. Simkins Industries, Inc.,* 847 F.2d 1109, 1112 n. 3 & 1113 (4th Cir.1988) (finding injury to aesthetic and environmental interests sufficient where pollution would affect river along which a single group member hiked), *cert. denied,* 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989); *Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 61 (2d Cir.1985) (holding that two affidavits testifying to the recreational use of the river and finding the pollution offensive to aesthetic values sufficient to demonstrate injury).

With the first element of the *Valley Forge* test satisfied, we turn now to the second factor—whether the injuries suffered by SOC's members are "fairly traceable" to Trinity's alleged failure to obtain a permit. Trinity acknowledges that its activities on the Skyline Landfill have

reduced the total acreage of the ponds by half, and that the FWS has reported that, "[b]ecause the

upper ponds have been drained, they now have considerably less value for wildlife." Further, as the

Third and Fourth Circuits have suggested, the "fairly traceable" element does not require that the

plaintiffs "show to a scientific certainty that defendant's effluent, and defendant's effluent alone,

caused the precise harm suffered by the plaintiffs." *Powell Duffryn,* 913 F.2d at 72; *Natural*

*Resources Defense Council, Inc. v. Watkins,* 954 F.2d 974, 980 n. 7 (4th Cir.1992). Under the

developed tests, we find the second element satisfied.

To meet the third requirement, SOC's members must demonstrate that their injuries are

"likely to be redressed by a favorable decision." The redressability factor focuses upon the connection

between the plaintiff's injury and the judicial relief sought. *Allen v. Wright,* 468 U.S. 737, 753 n. 19,

104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984). It is obvious the third element is satisfied.

Enjoining Trinity's activities would redress the injuries suffered by SOC's members by preventing the

further destruction of the wetlands.

We conclude that the district court held properly that SOC, as a representational

organization, had standing to bring this suit. SOC has shown more than a mere "general interest in

environmental preservation."[11]

## B. Statutory Coverage

SOC maintains that because Trinity's continued draining of, discharging into, and ultimate

---

[11]Our standing analysis need not apply the reasoning recently employed by the Supreme Court in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). There, the Court faced a question of statutory, as distinguished from constitutional standing, *see Powell Duffryn,* 913 F.2d at 84 (Aldisert, J., concurring) (recognizing constitutional/statutory distinction in *Lujan* ), and addressed alleged violations under NEPA, the APA, and the Federal Land Policy and Management Act of 1976 ("FLPMA"), but not the CWA. As the Court noted, neither the FLPMA nor NEPA provides a private right of action for violations of its provisions—thus judicial review of agency action was possible only if authorized by § 10(a) of the APA. 497 U.S. at ——, 110 S.Ct. at 3185. Because the CWA does specifically provide such a private right of action, 33 U.S.C. § 1365(a), we properly employ a constitutional standing analysis, as opposed to a statutory analysis under the APA.

filling of the wetlands without a permit is a violation of sections 301 and 404 of the CWA, there is also federal question jurisdiction. Trinity contends that because section 505, the citizen's suit provision, refers to a violation of an effluent standard, limitation or order, SOC is precluded from bringing suit against Trinity for failure to seek a permit. Trinity argues that without a discharge of effluent no violation exists, and no jurisdiction is created.

Passed in 1972 with the stated objective of restoring and maintaining the integrity of the waters of the United States, the CWA seeks to achieve this goal "by the application of increasingly more stringent "effluent limitations' designed to reduce gradually the amount of pollutants discharged into waterways." *Sierra Club v. Shell Oil Co.,* 817 F.2d 1169, 1173 (5th Cir.), *cert. denied,* 484 U.S. 985, 108 S.Ct. 501, 98 L.Ed.2d 500 (1987). In precise language, the CWA prohibits "the discharge of any pollutant by any person" except as authorized by specific sections of the Act. 33 U.S.C. § 1311(a).[12] Specific authorization includes the discharge of "dredged or fill material" pursuant to a permit issued under section 404 of the CWA.[13] 33 U.S.C. § 1344(a). Any discharge of this material without such a permit is, of course, prohibited. Violations of the provisions of the CWA, may be redressed through a private citizen enforcement action:

> any citizen may commence a civil action on his own behalf—(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B)

---

[12]The term "discharge of a pollutant" is defined by the statute as constituting "any addition of any pollutant to navigable waters from any point source...." 33 U.S.C. § 1362(12). The CWA then, in turn defines "pollutant" as the following:

> The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

33 U.S.C. § 1362(6).

[13]Dividing authorizing jurisdiction between the EPA and the Corps, the CWA allocates responsibility to the Corps to issue permits for the discharge of dredged or fill material into navigable waters pursuant to section 404 (33 U.S.C. § 1344). The EPA, on the other hand, is responsible for issuing permits for all other discharges of pollutants under section 402 (33 U.S.C. § 1342).

an order issued by the Administrator or a State with respect to such a standard or limitation.... 33 U.S.C. § 1365(a). Thus, the CWA "intertwines the jurisdiction of the district court with the grounds for relief in a citizen enforcement action." *Sierra Club,* 817 F.2d at 1171. Without the violation of either (1) an effluent standard or limitation under the CWA, or (2) an order issued with respect to these standards and limitations, the district court lacks jurisdiction to act. The basic question is: do these requirements constitute the sole ground for coverage under the statute? The decision of the district court went beyond these two defined violations and found that draining a wetland, per se, requires a permit under section 404 of the CWA. No discharge was relied upon as any part of the justification by the court of its decision.

In interpreting the statute to determine whether it covers a violation as recognized by the district court, "we begin, of course, with the words of the statute." *Phillips v. Marine Concrete Structures, Inc.,* 895 F.2d 1033, 1035 (5th Cir.1990). In so doing, our function "is to construe the language so as to give effect to the intent of Congress." *United States v. American Trucking Ass'ns,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). The district court, in its interpretation of the CWA, relied heavily, if not entirely upon the Act's legislative history to divine its congressional intent. However, "[t]he most persuasive evidence of Congressional intent is the wording of the statute." *Sierra Club v. Train,* 557 F.2d 485, 489 (5th Cir.1977).

By its clear and unambiguous terms, the CWA proscribes "the discharge of any *pollutant* by any person" into the waters of the United States, 33 U.S.C. § 1311(a) (emphasis added). It then specifically requires a permit, with exceptions irrelevant in this case, "for the discharge of *dredged or fill material*" into these waters, 33 U.S.C. § 1344(a) (emphasis added). The conclusion is inescapable. The existence of discharge is not critical. The discharge must be of effluent or dredged or fill material. The discharge of effluent is not, as SOC urges, merely an aggravating factor when addressing whether or not a section 404 permit is required. On the face of the statute, it is the requirement for statutory coverage.

The plain language of a statute cannot be wholly bypassed on the way to an interpretation of its more indeterminate legislative history. "Where the statute is so lucid, we need not look to the legislative history for further guidance." *Phillips,* 895 F.2d at 1035. While legislative history admittedly aids in discerning the parameters and purpose of an ill-defined statute, "[i]n the absence of a "clearly expressed legislative intention to the contrary,' the language of the statute itself "must ordinarily be regarded as conclusive.' " *United States v. James,* 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). We conclude that the statutory provisions are clear and unambiguous.

Throughout the course of this case, the EPA and the Corps have vigorously agreed with the conclusion that the CWA only addresses discharges of effluent. The unequivocal language found in their own regulations and guidelines promulgated pursuant to section 404(b) of the Act bolsters this contention:

> The purpose of these Guidelines is to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material.

40 C.F.R. 230.1(a);

> These Guidelines have been developed ... under section 404(b)(1) of the Clean Water Act (33 U.S.C. 1344). The Guidelines are applicable to the specification of disposal sites for discharges of dredged or fill material into waters of the United States.

40 C.F.R. 230.2(a). *See also* 33 C.F.R. 320.2(f) (describing the Corps' authority pursuant to section 404 of the CWA "to issue permits, after notice and opportunity for public hearing, for the discharge of dredged or fill material into the waters of the United States at specified disposal sites"). Further, 33 C.F.R. 323.1 describes the Corps' program as the regulation of "discharge of dredged or fill material into waters of the United States".

We accord substantial weight to these interpretations, as "[a]n agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985) (citing *Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107–08, 84 L.Ed.2d 90 (1985)); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)). Even if we would have arrived at a different interpretation, "if the agency's interpretation is reasonable the court must respect it." *Avoyelles Sportsmen's League, Inc. v. Marsh* (*Avoyelles III* ), 715 F.2d 897, 910 (5th Cir.1983) (citing *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)).

Recognition of the "discharge" requirement as the triggering mechanism for section 404 coverage is by no means novel. Courts have consistently applied section 404 only after finding that discharges of effluent into navigable waters were involved. *See, e.g., Riverside Bayview Homes, Inc.,* 474 U.S. at 124, 106 S.Ct. at 458 (holding wetlands property to be subject to Corps' section 404 permitting authority after Corps sought to enjoin placement of fill materials on wetland area); *United States v. Tilton,* 705 F.2d 429, 430 (11th Cir.1983) (enjoining the further discharge of fill material "consisting of woodchips, pine bark and soil" without a section 404 permit); *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 898 (Fed.Cir.1986) (holding that if there was no discharge of pollution, then the Corps "had no statutory authority to act" under section 404), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *United States v. Larkins,* 657 F.Supp. 76, 80, 85 (W.D.Ky.1987) (requiring a section 404 permit for the "use of earthmoving equipment to construct earthen dikes and levees on wetlands," which had resulted in "unauthorized deposition of material into water of the United States"), *aff'd* 852 F.2d 189 (6th Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1131, 103 L.Ed.2d 193 (1989).

The cases relied upon by the district court in ruling that a discharge is *not* required to trigger

the coverage of section 404 belie the court's conclusion. *See Save Our Community v. EPA,* 741 F.Supp. at 613–15. Beginning with *Avoyelles Sportsmen's League v. Marsh,* 715 F.2d 897, 923–24 (5th Cir.1983), the district court apparently did not view as critical the fact that in addressing the landowners' land clearing activities in *Avoyelles,* this Court held that the district court "correctly decided that the landclearing activities on the [wetland tract] constituted a discharge within the meaning of the [CWA]." Affirming that the bulldozers and backhoes used in the landclearing were "point sources" that created discharges by collecting "into windrows and piles material that may ultimately have found its way back into the waters," 715 F.2d at 922, this Court held "that the material discharged in this case was "fill,' if not "dredged,' material and hence [was] subject to the Corps' regulation under section 404, as long as the activities did not fall within the section 404(f) exemption." *Id.* at 924.

Next, the district court construed our decision in *Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 647 (5th Cir.1983) to stand for the proposition that a section 404 permit will not be required when an activity will not convert or destroy wetlands by materially affecting their drainage patterns. So, conversely, the district court inferred that when wetlands *are* converted or destroyed in this way, a section 404 permit *is* required. Again, this reliance is misplaced. Our decision in *Sands* that a section 404 permit was not required turned instead upon the Corps' determination that, under the facts and circumstances of that case, the "materials" produced by the clearing of wooded swampland "[did] not qualify as dredged or fill materials under [the Corps'] definitions." 711 F.2d at 647. Consequently, it was not, as the district court contended, the fact that the wetlands in *Sands* would not be entirely destroyed that distinguishes that case from *Avoyelles Sportsmen's League v. Alexander,* 473 F.Supp. 525 (E.D.La.1979) ("*Avoyelles I*" ). Instead, as we specifically noted in *Sands,* "[t]he definition of fill material highlights the fundamental difference that exists between this case and the *Avoyelles* decision." 711 F.2d at 647.

Thus, in these cases and all the other cases upon which the district court relied, the holdings

were based upon a finding of a discharge of pollutants. We must conclude that without the existence of an effluent discharge of some kind, there is no coverage under section 404. There is no jurisdiction for the agencies or the courts to act. We must remind again that the federal government has not taken upon itself to resolve all environmental issues which arise in the United States. *Save Barton Creek Ass'n v. Federal Highway Administration,* 950 F.2d 1129, 1144 (5th Cir.) *cert. denied, —— U.S. ——,* 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992).

Determining whether a discharge of effluent occurred in this case, therefore, becomes crucial. The activity at issue here involved the draining of wetlands via the use of a mechanical pump. Trinity utilized the water pumped to irrigate the sod cover on the landfill. While filling activity was indisputably contemplated after the draining had caused the area to lose its wetlands characteristics, Trinity undertook to avoid any and all discharges of fill, or other material, during the draining phase. Both the EPA and the Corps assured Trinity that if no discharges would be involved, then the removal of water from the ponds did not constitute a regulated activity under the CWA, and thus did not require a section 404 permit.

Few cases involve the narrow issue of whether the removal of water from wetlands constitutes a discharge and requires a permit from the Corps. The dearth of case law on this issue is not surprising. We have found no suit in which the Corps undertook to prevent the removal of water from wetlands. In a case solidly controlling, we held that the deliberate draining of a swamp is not a discharge of fill material. In *Orleans Audubon Society v. Lee,* 742 F.2d 901 (5th Cir.1984), the Orleans Audubon Society sued the New Orleans District of the Corps of Engineers to require the Corps to take action to prevent the draining of a cypress-tupelo gum swamp by C.I.T. Corporation. By draining and later filling the wetland area, C.I.T. intended to convert the tract for residential use. Orleans contended that the installation of two drainage culverts between a wetlands area and an adjacent drainage canal to accomplish the draining "violated the CWA because they resulted in the depositing of dredged or fill material into either the C.I.T. tract itself or into the [drainage canal]...."

*Id.* at 910. The record explicitly showed, however, that only clear water flowed through the culverts into the canal,[14] i.e., no discharges of effluent occurred. We held in agreement with the Corps' determination that there was no section 404 requirement for C.I.T. to obtain a permit for the drainage operation: "Clear water is not within the definition of a pollutant under the CWA." *Id.* at 910.

Orleans further argued that section 404(f)(2) (related to dredged or fill material only) prohibited the drainage of the water from the C.I.T. tract. The drainage, Orleans maintained, was "incidental to an activity which is intended to bring about the conversion of a wetland, the C.I.T. swamp, into non-wetland area which can then be developed into a residential area without governmental approval." *Id.* n. 16. We found that, although cognizant of this possibility, as was the Corps, we could not require an exercise of nonexistent jurisdiction. We said that "Section 404(f)(2) applies *only* when dredged or fill material has been discharged, and water is simply not dredged or fill material. Orleans' assertion that vegetation from the tract (which, it argues, constitutes a pollutant) was also being removed through the culverts was not supported by the record."[15] *Id.* (emphasis in original).

The district court undertook to distinguish *Orleans'* pivotal holding. Our finding in the body of the opinion was that, absent a finding of discharge, draining activity that converts a wetland does not trigger section 404 jurisdiction requiring a permit. Instead, the district court focused upon our

---

[14]Specifically, "[t]he Corps' on-site investigator reported that he found "no evidence of any discharges regulated under section 404 of the Clean Water Act.' " 742 F.2d at 910.

[15]At oral argument, SOC contended that the recapture provision in section 404(f)(2) should be read broadly, in essence, to apply outside of the context of section (f)(1). According to SOC, the recapture provision states that "[a]ny discharge of dredged or fill material into the navigable waters incidental to any activity" that converts a wetland requires a permit. Thus, since Trinity's drainage operation has as its purpose changing the use of the subject waters where "the reach of such waters" may be reduced, compliance with CWA via a permit is necessary. Under this interpretation, any discharge, even if *de minimis,* requires regulation. Although we need not decide this issue today, we point out that the argument contrasts with our decisions in *Avoyelles III,* 715 F.2d at 926 (stating that "[r]ead together, the two parts of section 404(f) provide a narrow exemption for agricultural and silvicultural activities that have little or no adverse effect on the nation's waters"). In *Orleans,* the statutory exemption under section 404(f) was not directly at issue, but we intimated its narrow application.

dismissal of Orleans' claim that section 404(f)(2) applied. This limitation of the scope of *Orleans* led the district court to the conclusion that "the [*Orleans* ] court restricted its discussion to the limiting clause of § 404(f), which provides for very narrow exceptions to the permit requirement." *Save Our Community,* 741 F.Supp. at 615 n. 17. Thus, the district court held, "[t]he *Orleans* court's brief analysis cannot be understood to mean that the Act permits the wanton destruction of wetlands through draining activities. However, to the extent that *Orleans* conflicts with *Avoyelles III, Save Our Wetlands,* and *York,* this Court follows the path cleared by the latter decisions." *Id.* We did not, however, limit our holding to the application of section 404(f). Furthermore, our reading of these later cases fails to discern any divergence from our *Orleans* approach.

As an alternative argument to its assertion that drainage alone requires a permit, SOC contends that even if draining without a discharge is not regulated under the CWA, discharging pollutants certainly is. According to SOC, the district court made a finding of fact that there were some "minor" discharges. *Save Our Community,* 741 F.Supp. at 609, Finding of Fact No. 14. SOC relies primarily on two observations by the FWS. First, it cites FWS' May 27, 1989 correspondence to the TDH recommending the denial Trinity's landfill permit application:

> Pumped water has been discharged into a makeshift ditch resulting in significant erosion above the ditch's outfall to Pond F and subsequent deposition of fill material in Pond F.

Second, it cites other FWS correspondence to Trinity on February 22, 1990, reiterating similar contentions:

> Regarding siltation, the most prominent example noted by our staff in a site-visit on March 14, 1989, was the deposition of recently eroded soil in Pond F resulting from water pumped from Pond A into a make-shift ditch.

Trinity counters first by stating that by the district court's own admission, whether minor discharges have occurred or not was declared to be irrelevant to the district court's decision. The only basis for the court's prohibition against draining was its determination that draining is a regulated

activity under section 404.[16]  Second, it asserts that the district court's finding concerning discharge is clearly erroneous.  Under *State of Missouri ex rel. Ashcroft v. Department of the Army, Corps of Engineers,* 526 F.Supp. 660, 678 (W.D.Mo.1980), *aff'd,* 672 F.2d 1297, 1304 (8th Cir.1982), as a matter of law, erosion of soil as a result of releases of water is simply not a discharge regulated by the CWA.  Third, finding of minor discharge is not equivalent to a finding of a violation of section 301(a).  According to Trinity, many minor discharges are authorized pursuant to broad nationwide permits issued under section 404(e), 33 U.S.C. § 1344(e), and 33 C.F.R. § 330.5.

Trinity also urges that a genuine dispute concerning material facts remains on the issue as to whether any discharge at all occurred.  At the district court level, Trinity disputed the factual accuracy of the discharges finding by proffering an affidavit from Trinity's Environmental Engineer Manager–Texas stating that Trinity would not discharge any dredged or fill material into the pond areas without a determination that those areas were not jurisdictional waters, if they were, a section 404 permit would be obtained from the Corps.

First, we emphasize that it is not contested that the district court relied exclusively on its finding of draining, not discharge, to find section 404 jurisdiction.  The Federal defendants urge and even Trinity concedes, denial of the summary judgment and the remand is necessary to resolve this disputed factual issue.  As to Trinity's second assertion, SOC seeks to characterize the siltation alleged as redeposited wetlands material.  It cites to *Avoyelles III,* 715 F.2d at 923, for the proposition that the term "discharge" under the section 404 regulations covers the redepositing of materials taken from the wetlands.  Faced with an incomplete factual record on this issue, we also

[16]The Federal defendants express a similar concern.  They assert that the district court did not rely on the existence of a discharge as the basis for its permanent injunction, and in fact made it clear that such a discharge was immaterial to its decision.  Further, since the district court's finding of a discharge was based solely on two letters from the Fish and Wildlife Service, this can "hardly form a firm basis" for a conclusion that discharge has in fact occurred.  They assert, nonetheless, that if this Court accepts the argument that the CWA requires permits only for discharge of a pollutant, the appropriate remedy would be to remand to the district court for reconsideration under a correct interpretation of the CWA—potentially, whether a discharge has occurred.

must leave its determination for the district court.

Third, SOC maintains that contrary to Trinity's contentions, the discharges observed by FWS are subject to section 404 jurisdiction, even if they constitute *de minimis* discharges. A *de minimis* exception is not explicitly mentioned under section 404. But it is recognized in regulations exempting from section 404's permit requirement those activities involving only *de minimis* discharge. The Corps' current definition of "discharge of dredged material," at 33 C.F.R. 323.2(d), provides that "*de minimis,* incidental soil movement occurring during normal dredging operations" is not considered to be within this regulatory definition. Further, the EPA's regulations contain a similar definition with the same exclusion. *See* 40 C.F.R. 232.2(e).[17] Because it is unclear from the record the extent of or if any prohibited discharge has occurred, we need not now consider the issue of the extent to which *de minimis* discharges require permits under section 404 of the CWA.

## C. Attorneys' Fees

The district court awarded SOC attorneys' fees, expenses, and court costs as the prevailing party in this lawsuit. *See* 33 U.S.C. § 1365(d). Since we determine that the district court erred in finding that Trinity's activities required a permit under section 404, the award of attorneys' fees to

---

[17]Proposed rules concerning a *de minimis* discharge are in the commentary phase. In the commentary, the Corps and the EPA note that the *de minimis* exclusion serves in part "to avoid duplicative regulation of dredging itself in waters within the jurisdictional scope of the Rivers and Harbors Act." As the Corps and the EPA concede, however, "[o]ver the years, application of this "de minimis' language has become problematic, especially when applied to activities which did not involve dredging for the purposes of maintaining navigation in traditionally navigable waters." 57 Fed.Reg. at 26895. Under its proposed rules, the new language would undertake to clarify by providing:

> [A]part from the exclusion for "normal dredging operations," the term "discharge of dredged material" includes any discharge, i.e., addition or redeposition, of excavated material into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation, which has or would have the effect of destroying or degrading any area of the waters of the United States. The term "discharge of dredged material" does not include *de minimis* soil movement incidental to activities which do not or would not have such an effect."

*Id.*

SOC was not justified. *See Chemical Manufacturers Ass'n v. United States EPA,* 885 F.2d 1276, 1279 (5th Cir.1989) ("an award is usually "appropriate' when a party has advanced the goals of the statute invoked in the litigation").

### III. CONCLUSION

We hold that the wetlands draining activity per se does not require a section 404 permit under the CWA, as only activities involving discharges of effluent necessitate obtaining such a permit. Consequently, we dissolve the injunction. Further, viewing the evidence and drawing all inferences in the light most favorable to Trinity, the non-moving party, we conclude that there are disputed issues of material fact regarding the existence of the exact nature of a discharge alleged. *Bozé v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990) (per curiam). Because the existence, nature, and extent, including redepositing, of an alleged discharge was not considered by the district court, we reverse the summary judgment and remand to the court, as coverage of the statute turns upon this determination. We find the mandate of the statute is clear.

INJUNCTION DISSOLVED, SUMMARY JUDGMENT REVERSED. REMANDED.