# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-40259

United States Court of Appeals
Fifth Circuit

**FILED**

August 9, 2017

Lyle W. Cayce
Clerk

FRIENDS OF LYDIA ANN CHANNEL,

> Plaintiff - Appellee

v.

UNITED STATES ARMY CORPS OF ENGINEERS;
LIEUTENANT GENERAL TODD T. SEMONITE, in his official capacity, Commanding General and Chief of Engineers, United States Army Corps of Engineers; COLONEL LARS N. ZETTERSTROM, in his official capacity, District Engineer and Commanding Officer, Galveston District, United States Army Corps of Engineers; KIM MCLAUGHLIN, in her official capacity, Chief Regulatory Division, Galveston District, United States Army Corps of Engineers,

> Defendants - Appellees

v.

LYDIA ANN CHANNEL MOORINGS, L.L.C.,

> Intervenor Defendant – Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:15-CV-514

No. 17-40259

Before JONES, CLEMENT, and ELROD, Circuit Judges.

EDITH H. JONES, Circuit Judge: *

The Friends of Lydia Ann Channel obtained a preliminary injunction stopping the operations of a barge fleeting facility that was approved by the U.S. Army Corps of Engineers and commenced operations in early 2015. Friends persuaded the district court in March 2017 to order this extraordinary relief because of the facility's alleged imminent endangerment of two turtle species found in the Channel. *See* 16 U.S.C. § 1538(a)(1). On appeal, Friends barely defends the Endangered Species Act (ESA) claim. Indeed, during oral argument in this court, Friends's counsel conceded that, all turtles aside, the members simply "don't want all these barges there." Friends emphasizes instead an alternate theory, violation of the National Environmental Policy Act (NEPA), to sustain the preliminary injunction. *See* 42 U.S.C. § 4321 *et seq.* Not surprisingly, such unusual vacillation betokens the inherent weakness of Friends's claims. We VACATE the injunction, DISMISS in part, and REMAND.

## BACKGROUND

The Lydia Ann Channel is part of the Gulf Intracoastal Waterway along the Texas coast. The Channel, about 1500 feet wide, lies next to Port Aransas and close to the Port of Corpus Christi, a bustling Texas maritime center. Commercial and pleasure craft, including hundreds of barges, traverse the Channel each month. Due to scheduling gaps at the Port of Corpus Christi, maintenance, bad weather, and the like, the barges may require "downtime." In the absence of sufficient fleeting facilities, barge operators have been known

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## No. 17-40259

to secure downtime by grounding barges along the Channel's shoreline—simply parking barges wherever they can.

Appellant Lydia Ann Channel Moorings, L.L.C. (LACM) proposed to build its fleeting facility as an alternative to grounding. In June 2014, LACM sought permission from the Corps to construct mooring dolphins—pylons to which barges can be moored—parallel to the Channel's shoreline in water no less than 12 feet deep. The proposed mooring dolphins would be concrete-filled 24-inch steel pipes that extended 30 feet below the mud line. LACM's stated purpose for the project was to:

> [P]rovide temporary mooring for barges and tugs inside Lydia Ann Channel (Fleeting). To provide a Coast Guard [a]pproved security plan for area. To provide a[n] Oil Spill Response Program for area. To provide 24 hour on site security and tug assist for moorings of such barges. To provide above area as alternative to barges that are presently grounding in area on shore and damaging shoreline, sea grass, etc.

LACM also requested and obtained a 20-year lease for the project area from the Texas General Land Office.

The Corps issued a letter of permission on January 15, 2015, granting LACM's "request . . . to construct a fleeting area in the Lydia Ann Channel."[1] As the Corps later recounted, "the structures and work were determined to be minor, would not have significant individual or cumulative impacts on environmental values, and should have encountered no appreciable opposition." LACM built and began to operate the facility in March 2015.

---

[1] A letter of permission is "a type of permit issued through an abbreviated processing procedure which includes coordination with Federal and state fish and wildlife agencies, as required by the Fish and Wildlife Coordination Act, and a public interest evaluation but without the publishing of an individual public notice." 33 C.F.R. § 325.2(e)(1). Such a letter may be used when, as the Corps initially found in this case, "the proposed work would be minor, would not have significant individual or cumulative impacts on environmental values, and should encounter no appreciable opposition." *Id.* § 325.2(e)(1)(i).

No. 17-40259

Displeased with this development, local residents formed a non-profit organization named Friends of Lydia Ann Channel (Friends) whose sole mission has been to stop the barge operations. Friends sued the Corps in December 2015, alleging violations of NEPA and the ESA, in addition to claiming that LACM's facility did not comply with the Corps' letter of permission.

The Corps soon reversed course concerning the LACM facility. Its personnel visited the facility and determined that "[t]he pilings constructed were not of the same engineering design as the pilings authorized in the [letter of permission], and their locations are located up to 17 meters away from where they are authorized to be installed." In September 2016, the Corps suspended and revoked LACM's letter of permission. LACM also received a notice of default on its lease from the Texas General Land Office.

The Corps thereafter ordered LACM to "immediately submit, for the Corps' authorization, a restoration plan that provides for removal of all structures and restoration of the impacted area." LACM did so, noting, but questioning, various ways to remove the mooring dolphins and recommending a "no action alternative" that would leave the mooring dolphins in place. At this time, the Corps is treating LACM's proposal as a request for a new permit, and the Corps expects that it will take several months—and perhaps a few years—before a permitting decision is made. Until it completes its review, however, the Corps asserts that it lacks "unilateral authority to force LACM to stop using the existing pilings."

In the meantime, the district court permitted LACM to intervene as a defendant in Friends's lawsuit against the Corps. Friends then amended its complaint, seeking, among other things, "a preliminary injunction to restrain LACM from continuing to operate its barge fleeting facility and from using the unauthorized mooring structures." *See* 16 U.S.C. § 1540(g)(1) (authorizing

4

citizen suits to enjoin violations of the ESA). Friends's theory against LACM rested on the prohibition of "takes" of endangered and threatened species under Section 9 of the ESA. *Id.* § 1538(a)(1)(B). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). Friends argued that LACM's continued operations would unlawfully "take" the endangered Green Sea Turtle and Kemp's Ridley Sea Turtle in two ways. First, the turtles could collide with barges when they experience "cold stunning"—a potentially fatal inability to react to surrounding events—when the water temperature drops below 50 degrees (Fahrenheit). Second, the turtles may come to feed on moss growth on the mooring dolphins and be killed when trying to escape barges arriving at the moorings. There is no evidence that LACM's operations at the fleeting facility have caused a single turtle "take."

The district court wrote a total of two paragraphs devoted to the facts of the ESA violations, in which it discredited LACM's expert testimony and adopted wholesale Friends's theories of unlawful takes. These findings, in turn, undergird the court's other determinations necessary to support a preliminary injunction against LACM's operations. The court issued no ruling on Friends's complaint of noncompliance with NEPA. The court also stayed further litigation until the Corps completes its review process.

LACM now appeals. For its part, the Corps has filed a brief taking no position on the injunction because it "is directed only at LACM," "addresses only [Friends's] ESA Section 9 claims against LACM," and "was not entered against the Corps."

## ANALYSIS

"A preliminary injunction is an 'extraordinary remedy' that should be granted only if the movant establishes (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is

not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536–37 (5th Cir. 2013) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).    This court "review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Id.* at 537.

As discussed above, although the district court rooted its preliminary-injunction analysis in the ESA, Friends defends the injunction primarily under NEPA.    We first address the ESA analysis before turning to NEPA and potential ripeness and mootness problems.    In the end, neither the ESA nor NEPA provides a basis for the injunction.

## A.    Endangered Species Act

LACM challenges the district court's finding that Friends has proved a likelihood of success on the merits at trial of ESA take claims.    "Success on the merits" in this context means Friends would obtain a permanent injunction against LACM.    A court's power to order injunctive relief "depends, as in all other cases, on whether plaintiffs have established by a preponderance of the evidence, that there is 'a reasonably certain threat of imminent harm to a protected species.'" *Aransas Project v. Shaw*, 775 F.3d 641, 663–64 (5th Cir. 2014) (quoting *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000)).    Put otherwise, "[a]n injunction may thus be issued only if future injury is 'certainly impending.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

On the record before us, neither of Friends's take theories demonstrates a threat of reasonably certain, imminent harm to the endangered turtles.    The first theory concerns cold-stunning.    In sub-50-degree water, the cold will render the endangered turtles lethargic, unable to react to barge traffic, and

6

thus susceptible to injury or death by barge impact. The district court described Friends's expert as testifying that there was "a high probability" of this kind of "direct take."[2] The court credited the expert's opinion that such a take was "likely to occur due to a 'cold stunning' event." And the court found that "the threat of harm posed by cold stunning events remains imminent."

But the conditions required for that harm to occur are neither imminent nor reasonably certain. The triggering condition is water temperatures in the Channel below 50 degrees. From November 2007 to February 2015, the water temperature in the Channel dropped below 50 degrees during only four winters.[3] As might be expected, the temperature drops were recorded between mid-November and late February. Within the winter months, the water temperature dropped to that extent only occasionally and for a few days at a time. Given the sporadic and unusual occurrence of this necessary condition in the Channel, it is doubtful that cold stunning by itself is either "imminent" or "reasonably certain."

Cold stunning caused by the weather cannot make LACM guilty of an ESA take, however. The court's conclusion is based entirely on the water

---

[2] Whether this theory involves a potential "direct take" of turtles by LACM's facility or an indirect consequence for which proximate cause and foreseeability are required is an issue we need not decide as Friends has not shown a likelihood of success on the merits regarding *any* unlawful "take."

[3] Two points of clarification bear mentioning here. First, the chart on which LACM relies (and which Friends does not dispute) for this information spans November 2007 to October 2015. But the preceding text notes that there is a "data gap[]" for the winter of 2015–16. For that reason, we do not include that winter in the time period that forms the basis of this analysis. Second, the chart shows that water temperatures dropped below the 50-degree line during only three winters (the 2010–11, 2013–14, and 2014–15 winters). But the preceding text notes that there is a "data gap[]" for the winter of 2009–10, and goes on to explain that the water temperature likely dropped below 50 degrees because cold-stunned turtles were discovered. We, therefore, assume that such a drop did indeed occur, which brings the total number of winters during which water temperatures fell below 50 degrees to four.

condition alone and fails to grapple with the even less likely prediction that the fleeting facility's existence might cause imminent and reasonably certain harm. To find LACM "caused" a take based on a cold stunning event, a court must hypothesize that (1) a turtle would have to be present in the path of a barge in the 1500-foot wide Channel; (2) the barge would have to be among the 15% of barge traffic through the Channel that: utilizes LACM's facility; (3) the barge could not avoid harming the turtle; and (4) whatever protective measures taken by LACM, from "monitors" to shutting down barge movements, are ineffective.[4] Taken together, this series of contingencies reduces to a minimal level the chance that the facility will "take" cold-stunned turtles.

Friends's back-up take theory is that turtles will try to feed on moss growth on the mooring dolphins and will perish when they try to "flee" oncoming barges. The district court credited this theory of "constant and ever present" harm, noting that Friends's expert "opined that algae that will grow on the mooring structures will attract Green Sea Turtles, who feed on the algae, to a location where they will not be able to dive deep enough to evade barge traffic."

But the expert's testimony on this point was far less definitive:

[I]t was my opinion that [LACM's operations] represented one additional threat to the turtles that aren't there now and that is that the – the mooring dolphins, those structures themselves, will allow a place for moss to develop and the sea turtles will indeed feed upon those. And if they are feeding upon those when these mooring operations are taking place and the sea turtles attempt to flee and if they attempt to flee by diving and if they essentially run out of water and hit the bottom, I felt that there was an opportunity there for a take to occur as well.

---

[4] Although LACM had no formal turtle protection protocol on file with the Corps, the company repeatedly represented to the court the type of protective measures it will employ against cold stunning, and Friends's expert found those helpful. We have no reason not to believe the in-court assurances provided by LACM.

No. 17-40259

The expert made at least three assumptions to reach the conclusion that a take was merely *possible*: (1) *if* turtles feed on moss on the mooring dolphins *when* mooring operations are taking place; (2) *if* they attempt to flee by diving; and (3) *if* they run out of water and hit the bottom; then there is an *opportunity* for a take to occur. That is quintessential speculation. Such speculation built upon further speculation does not amount to a "reasonably certain threat of imminent harm" to the endangered turtles.[5] *See, e.g., Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 6 (1st Cir. 1991) ("Likelihood of success cannot be woven from the gossamer threads of speculation and surmise.").

Having determined that neither of Friends's take theories—notably unsupported by any evidence that a turtle take has actually occurred—establishes a reasonably certain threat of imminent harm, Friends has not demonstrated a likelihood of success on the merits, and we need proceed no further. *See La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency,* 608 F.3d 217, 225 (5th Cir. 2010) ("Because we have determined that Plaintiffs cannot show a substantial likelihood of success on the merits, we need not address FEMA's additional arguments regarding the other necessary elements for preliminary injunctive relief. The holding on the initial element is sufficient to vacate the injunction."). As has been noted previously, all of the other criteria for a preliminary injunction—irreparable harm, balance of equities, and the public interest—were, in the district court's assessment, totally dependent on the inadequately supported take theories advanced by Friends. The ESA provides no basis for the injunction.

---

[5] Friends attempts to salvage its expert's testimony by deeming it "an awkward recapitulation of his written report," which, Friends says, was "neither equivocal or [sic] speculative." But that written report summarized the theory by stating, "If the turtle is unable to deep dive enough and quickly enough, direct take will occur." There, too, the expert's report depended on speculation about whether a turtle could (1) dive deeply enough and (2) dive quickly enough. Pointing to more speculation does not help Friends.

**B.    National Environmental Policy Act**

Friends now relies on its NEPA theory as an alternative basis for upholding the preliminary injunction.  NEPA requires "all agencies of the Federal Government" to prepare an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Friends claims that it is likely to succeed on its theory that the Corps violated NEPA by failing to prepare an EIS or take some related action, and this violation can support injunctive relief against the operation of the fleeting facility.  We disagree.

First, a NEPA challenge can only be maintained under the Administrative Procedure Act (APA) because NEPA confers no private right of action.  *See, e.g.*, *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) (citing *Noe v. Metro. Atlanta Rapid Transit Auth.*, 644 F.2d 434, 439 (5th Cir. Unit B May 1981)).  Federal courts have long exercised jurisdiction over NEPA challenges pursuant to the APA.  *See, e.g.*, *Sierra Club v. Slater*, 120 F.3d 623, 630–31 (6th Cir. 1997) (citing cases); *see also Save Our Cmty. v. EPA*, 971 F.2d 1155, 1161 n.11 (5th Cir. 1992) (same).

Second, "by its terms, the APA applies only to federal agencies." *S. Carolina Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 331 n.5 (4th Cir. 2008); 5 U.S.C. §§ 701 (with exceptions not relevant here, defining "agency" as "each authority of the Government of the United States"), 702 ("A person suffering legal wrong, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").

Consequently, it is well settled that suits under the APA may not be pursued against *nonfederal* entities, nor may federal courts enjoin nonfederal entities based on the conduct of federal agencies held to run afoul of the APA. *See Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 249 (5th Cir. 2006) ("the APA 'does not provide private plaintiffs a route for reviewing the actions of

nonfederal defendants such as [the Housing Authority of New Orleans]'");
*Resident Council of Allen Parkway Vill. v. U.S. Dep't of Hous. & Urban Dev.*,
980 F.2d 1043, 1055 (5th Cir. 1993) ("district court lacked the power to enjoin
[Housing Authority of the City of Houston] under the APA"); *Vieux Carre Prop.
Owners, Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1445 (5th Cir. 1991)
(*Vieux Carre II*); *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*,
875 F.2d 453, 456 (5th Cir. 1989) (*Vieux Carre I*) ("We fail to understand,
however, how APA-dictated reviewability of the Corps' decisions allegedly
violating the [Rivers and Harbors Act] gives the district court jurisdiction to
enjoin such nonfederal entities as the Audubon Park Commission."); *see also
Hayne Blvd. Camps Preservation Ass'n v. Julich*, 143 F. Supp. 2d 628, 631–32
(E.D. La. 2001) (Feldman, J.) ("[The APA] does not provide a route through
which plaintiffs can obtain injunctive relief against nonfederal defendants.
Thus, while the APA indisputably provides for judicial review of the decisions
of the Corps and FEMA, it does not provide a jurisdictional basis for this Court
to enjoin nonfederal defendants[.]" (citation omitted)).[6]

---

[6] Our research has uncovered one Fifth Circuit case that post-dates and does not cite
*Vieux Carre I. See Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129 (5th Cir.
1992). *Save Barton Creek* dissolved an injunction against nonfederal entities' construction
projects, but might be read to suggest that a court may enjoin a nonfederal entity if a federal
agency sufficiently influences or controls the nonfederal entity's activity. But *Save Barton
Creek* relies in part on a Tenth Circuit case with which *Vieux Carre I* disagreed. *Compare id.*
at 1135 (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988)), *with Vieux Carre
I*, 875 F.2d at 456–57 (addressing *Hodel* at length and describing its reasoning as "faulty").
Thus, if *Save Barton Creek* conflicts with the *Vieux Carre I, Vieux Carre I* controls. *See, e.g.,
Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled
Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's
decision, absent an intervening change in the law[.]").

Accordingly, Friends cannot obtain an injunction against LACM, a nonfederal defendant, for a claim under the APA that the federal agency violated NEPA.[7]

## C.    Ripeness and Mootness

We close with issues of ripeness and mootness raised in the briefing and at oral argument.  These arise in regard to the district court's decision to "stay" the litigation while the Corps completes review of LACM's revised application for a permit.  First, counsel for Friends conceded at oral argument that any claims related to the ongoing review process are not ripe for judicial review.  The district court thus lacks jurisdiction to consider these claims.  *See, e.g.*, *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (stating that a federal court lacks subject matter jurisdiction if there is no final agency action under the APA).  There is no basis for the court to "stay" or continue to exercise control over litigation for claims that may or may not ultimately be pursued.

Second, with regard to the now-revoked letter of permission, when asked at oral argument why the NEPA claim related to the letter is not moot, counsel for Friends stated that it "cannot be moot because the activity that resulted from [the letter], and which causes all the harms, is on[going]."  The district court agreed that the claims were not moot, and stated that "[a]t the time of the hearing on the preliminary injunction, LACM's operation was ongoing" and that the court at least had "the power to effectuate a partial remedy," that is, enjoining LACM's operations.

---

[7] We also note that even if there is a viable claim that the Corps violated NEPA in its initial issuance of LACM's permit, Friends made no record in the district court pertinent to the legal or factual issues that may be involved in this claim.  Moreover, because the Corps is an appellee here along with Friends, and there is no cross-appeal, the two relevant parties have failed to join issue on the NEPA claim and on the related Rivers and Harbors Act claim, 33 U.S.C. § 403.  For these additional reasons, the preliminary injunction cannot be sustained on Friends's alternative theory.

The court's conclusion is faulty on two grounds.  First, the preceding analysis shows that the court cannot enjoin LACM's operations under NEPA and the APA.  Moreover, an agency's violation of NEPA relates only to the *process* it has employed, not to the *outcome* of the review.  "NEPA dictates no particular substantive result."  *Spiller v. White,* 352 F.3d 235, 240 (5th Cir. 2003).  Thus, the NEPA claim related to the now-revoked letter is moot because Friends cannot obtain effectual relief from LACM's operation of the fleeting facility based on the now-revoked letter of permission.  *See Hooks v. Landmark Indus., Inc.,* 797 F.3d 309, 313 (5th Cir. 2015) (mootness occurs when it is impossible for a court to grant any effectual relief whatever to the prevailing party).

In sum, there is no basis for the district court to maintain jurisdiction over Friends's NEPA claims.

\* \* \*

For the foregoing reasons, we **VACATE** the preliminary injunction, **DISMISS** as moot Friends's claims based on APA/NEPA and the Rivers and Harbors Act, and **REMAND** for further proceedings consistent with this opinion.